SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Robert HASHO, Benjamin M. Hasho, William X. Mecca, Robert B. Yule, Kevin B. Sullivan, David C. Dever, Richard A. Chennisi, Aurelio Vuono, Philip Falcone, and Michael F. Umbro, Defendants.

No. 90 Civ. 7953.

United States District Court, S.D. New York.

Feb. 13, 1992.

Edwin H. Nordlinger, Deputy Regional
Adm'r, New York City, (Jeffrey Plotkin,

Allen Meyer, David Miller, of counsel), for plaintiff Securities and Exchange Com'n.

Caruso & Caruso, Brooklyn, N.Y. (Steven B. Caruso, of counsel), for defendants Benjamin M. Hasho, William X. Mecca and Robert B. Yule.

Kurzman Karelson & Frank, New York City (Kenneth I. Wirfel, of counsel), for defendant Aurelio Vuono.

## OPINION AND ORDER

EDELSTEIN, District Judge:

On December 13, 1990, the Securities and Exchange Commission (the "SEC") filed its complaint in this action alleging that defendants, ten registered representatives, engaged in unlawful high pressure sales of small highly speculative stocks, sometimes referred to in Wall Street parlance as "dogs," to unwary customers and caused trades to be entered in customer accounts without customer authorization. The SEC alleges that by such conduct, defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (the "Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder (the "anti-fraud provisions"). In essence, the SEC alleges that defendants engaged in a "boiler room" operation, which the Second Circuit has described as:

> a temporary operation established to sell a specific speculative security. Solicitation is by telephone to new customers, the salesman conveying favorable earnings projections, predictions of price rises and other optimistic prospects without a factual basis. The prospective buyer is not informed of known or readily ascertainable adverse information; he is not cautioned about the risks inherent in purchasing a speculative security; and he is left with a deliberately created expectation of gain without risk.

*Hanly v. SEC*, 415 F.2d 589, 597 n. 14 (2d Cir.1969). On December 13, 1990, the SEC also applied for an order to show cause and an order expediting discovery (the "Order") in connection with a motion for a preliminary injunction. This Court signed the Order and set a return date for a hearing on the SEC's motion for January 14, 1991.

On January 4, 1991, after a conference before this Court, the SEC and counsel for defendants Robert F. Hasho ("Robert Hasho"), Benjamin M. Hasho ("Ben Hasho"), William X. Mecca ("Mecca"), Robert B. Yule ("Yule") and Aurelio Vuono ("Vuono"), entered a stipulation and order maintaining the status quo. The January 14, 1991 hearing date was adjourned *sine die*.

On March 4, 1991, this Court: (1) issued a Final Judgment, on consent, permanently enjoining defendants David C. Dever, Michael F. Umbro, and Philip Falcone, from committing further violations of the antifraud provisions of the federal securities laws; (2) ordered that the preliminary injunction hearing be consolidated with the trial on the merits as to defendants Ben Hasho, Mecca, Yule and Vuono and further ordered that this trial commence on March 12, 1991; and (3) severed the case against defendants Robert Hasho,[1] Richard A. Chennisi and Kevin B. Sullivan and directed that it be tried at a later date. This Court subsequently issued Final Judgments, on consent, permanently enjoining defendants Robert Hasho, Richard A. Chennisi and Kevin B. Sullivan from committing further violations of the anti-fraud provisions of the federal securities laws.

On March 12, 1991, this Court commenced the trial of defendants Ben Hasho, Mecca, Yule, and Vuono. On March 15, 1991, defendants Ben Hasho, Mecca and Yule applied to this Court for an adjournment to retain new counsel. This Court granted the application and ordered that the trial of defendant Vuono continue. De-

---

1. On December 27, 1990, upon the SEC's application, this Court entered a default judgment against defendant Robert F. Hasho pursuant to Fed.R.Civ.P. 37, in connection with his failure to provide discovery to the SEC and in connection with his failure to attend a Court ordered conference. On February 11, 1991, upon defendant Robert Hasho's application, this Court set aside the default judgment against him. *See SEC v. Hasho*, 134 F.R.D. 74 (S.D.N.Y.1991).

fendant Vuono's trial ended with closing arguments on March 19, 1991.

On April 2, 1991, this Court proceeded to trial with defendants Ben Hasho, Mecca, and Yule. The trial ended on April 18, 1991, with closing arguments from the SEC and counsel for defendants Ben Hasho, Mecca, and Yule. The SEC offered the testimony of several customers of each defendant to support its allegations. These witnesses testified that defendants made several misstatements of fact, omitted certain information, and used other techniques to get them to invest in securities, including: (1) misleading statements by certain defendants about their past performances as registered representatives and unjustified predictions that their recommendations would produce future profits; (2) false statements by certain defendants that they possessed inside information; (3) false statements by certain defendants about the minimum amount of securities that customers were required to purchase; (4) omissions regarding risk factors, such as the speculative nature of securities and negative earnings of issuers; (5) baseless price predictions and profit guarantees; (6) misrepresentations about commissions; and (7) unauthorized trading in customer accounts. Defendants Ben Hasho, Mecca and Yule primarily contend that they did none of the wrongful conduct alleged in the SEC's complaint. Defendant Vuono argues, and the other defendants also each contend, that he is not responsible for the conduct alleged in the SEC's complaint because he acted at the direction of his employer and obtained the information passed on to his customers from his employer.

This case reveals an outrageous abuse of trust by registered representatives who consistently preyed upon unsophisticated and unsuspecting customers through a myriad of misrepresentations, omissions, and other fraudulent devices for personal profit. Defendants' conduct here is akin to dealers of "three card monte" who prey upon unwary individuals by holding out the promise of easy money. Defendants' conduct, however, is even more reprehensible because they had an inviolable duty to deal fairly with the public and their customers, and they had a relationship of trust with those they swindled. Defendants' contemptible conduct did more than harm their clients; their actions destroy investor confidence, pollute the environment for securities transactions, and bring disgrace and shame upon Wall Street.

Ben Hasho, Mecca, and Yule's contentions that they did none of the conduct alleged is incredible. Furthermore, while defendants' employers may have encouraged and fostered defendants' unlawful activities, this does not by any means give registered representatives license to ignore their duty of fair dealing to their clients and to violate the anti-fraud provisions of the securities laws. Registered representatives who engage in unlawful activity can not point the finger at their employers to insulate themselves from liability. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the following constitutes this Court's findings of fact and conclusions of law.[2]

## FINDINGS OF FACT

### I. Relevant Entities

Organized in November 1986, but now defunct, J.T. Moran & Co., Inc. ("J.T. Moran"), was a Delaware corporation that had its principal place of business in New York, New York. [Pl.Exh. 1801 at p. 4 & 31]. J.T. Moran was a wholly owned subsidiary of J.T. Moran Financial Corp. ("J.T. Moran Financial"). [Pl.Exh. 1801 at p. 31]. J.T. Moran was registered as a broker-dealer with the SEC, and, at all relevant times to this action, was a member of the National Association of Securities Dealers, Inc. [Pl. Exh. 1801 at p. 4]. J.T. Moran, which ceased operations in or about January 1990, employed approximately 600 registered representatives and maintained numerous branch offices in New York, including ones in Huntington and Garden City.

---

**2.** References to the trial transcript are indicated by "Trial." References to the SEC's exhibits in evidence are indicated by "Pl.Exh." References to a defendant's exhibits are indicated by "Df. [name of defendant] Exh."

[Pl.Exh. 1303 at p. 10; Pl.Exh. 1801 at p. 9]. In June 1989, the J.T. Moran Huntington office moved its operations to Garden City (hereinafter the "Long Island Office"). [Pl.Exh. 1303 at p. 11].

In or about May 1988, J.T. Moran acquired its Long Island Office from the Sherwood Capital Group ("Sherwood"). In or about early 1987, Sherwood had acquired this same branch office from First Jersey Securities, Inc. ("First Jersey"). These acquisitions occurred as each predecessor firm ceased retail operations. [Trial at p. 676]. Defendants Ben Hasho, Mecca and Yule each moved to the successor firm as their branch office was acquired.

## II. The Defendants

### A. Ben Hasho

Ben Hasho, a high school graduate, is 26 years old. From in or about October 1986 to in or about January 1987, he worked in his first job in the securities industry as a registered representative at First Jersey. [Pl.Exh. 1001 at p. 7, 11]. He subsequently became a registered representative at Sherwood during the course of 1987 until early 1988, and then at J.T. Moran from the beginning of 1988 to in or about January 1990. [Pl.Exh. 1001 at p. 19, 30]. He worked at the Long Island branch offices of First Jersey, Sherwood, and J.T. Moran. From in or about June 1990 to in or about late November 1990, he was a registered representative at Stuart–James Co., Inc. ("Stuart–James").

Ben Hasho earned approximately $50,000 in 1987, $80,000 in 1988, and $25,000 in 1989, in commissions from his customers' transactions in securities. [Pl.Exh. 1001 at p. 90]. He concentrated in the sale of "extremely speculative" and "low priced equities." [Pl.Exh. 1001 at p. 53]. In selling securities to the public, he relied completely on the information provided by the firm with which he was associated. [Pl. Exh. 1001 at pp. 15, 25, 52]. While at J.T. Moran, he never recommended a stock based to his own research. [Pl.Exh. 1001 at p. 52].

Ben Hasho "cold called"[3] for customers and used a telephone directory as a source of names for potential customers. [Pl.Exh. 1001 at pp. 13, 23, 37–38]. He made from 50–150 cold calls per day and used scripts when speaking to customers. [Pl.Exh. 1001 at pp. 14, 23, 37–38]. Often, he recommended the same stock to all customers and prospective customers on a given day. [Pl.Exh. 1001 at 46–47].

### B. Mecca

Mecca, a graduate of the State University of New York at Oswego, is 28 years old. He was a registered representative at First Jersey from on or about May 1986 through early 1987, at Sherwood from in or about February 1987 through May 1988, and at J.T. Moran from in or about May 1988 through January 1990. Mecca worked at the Long Island branch office of First Jersey, Sherwood, and J.T. Moran. [Trial at pp. 675–676, 799–800; Pl.Exh. 1101 at pp. 40–41, 46–47]. From in or about June 1990 through November 1990, he was a registered representative at Stuart–James. Prior to entering the securities industry in May 1986, Mecca had no securities related employment or investing experience. [Trial at pp. 800–801].

Mecca earned $240,000 in 1987, over $400,000 in 1988, $270,000 in 1989, and $102,000 in 1990. [Trial at pp. 801–803; Pl.Exh. 1101 at pp. 52, 187].[4] Approximately 70% to 80% of his income was derived from commissions earned on his customers' securities transactions and approximately 20% to 30% of his income was derived from "overrides" on commissions earned by other registered representatives. [Trial at pp. 807–808; Pl.Exh. 1101 at p. 52]. Mecca earned approximately 7 to 10% of the commissions earned by registered representatives on whom he received overrides. [Pl.Exh. 1101 at pp. 54–56]. He earned override income at both Sherwood and J.T. Moran. [Trial at pp. 807–808].

---

**3.** A "cold call" is a securities dealer's initial call to an unknown person during which the dealer seeks to enlist that person as a customer.

**4.** Mecca has recently declared personal bankruptcy. [Trial at p. 643].

From in or about May 1988 through January 1990, Mecca was a sales supervisor at J.T. Moran. [Trial at pp. 808–809; Pl.Exh. 1101 at pp. 47–52]. From in or about February 1987 through May 1988, he was a sales supervisor at Sherwood. [Trial at p. 808]. Mecca earned override income in connection with his supervisory activities. [Trial at pp. 809–810; Pl.Exh. 1101 at pp. 53–61]. His supervisory activities included: (1) "motivating" other registered representatives, (2) discussing firm stock recommendations with other registered representatives, and (3) teaching other registered representatives how to make stock recommendations to customers. [Trial at pp. 808–809; Pl.Exh. 1101 at pp. 49–52]. Mecca also received new account forms and order tickets submitted by other registered representatives. [Pl.Exh. 1101 at pp. 50–52].

He held various titles at J.T. Moran, including Vice–President, Senior Account Executive, Registered Principal, and Branch Manager. [Trial at pp. 803–807; Pl.Exh. 1101 at pp. 47–48; Pl.Exh. 3002]. He used business cards that identified him as either a Vice–President or Branch Manager, and he told customers that he "ran the office." [Pl.Exh. 1101 at pp. 47–48; Trial at p. 634]. Mecca, however, was not a licensed supervisor. In 1989, he failed the "Series 24" examination for the licensing of securities firm supervisors. [Trial at pp. 803–804, Pl.Exh. 1101 at pp. 42–43].

Mecca knew that First Jersey, Sherwood and J.T. Moran specialized in recommending high risk speculative securities issues. [Trial at pp. 815–816]. While working at First Jersey, Sherwood and J.T. Moran, Mecca specialized in the recommendation of high risk speculative securities issues. [Trial at p. 816]. Mecca recommended only those securities brought to his attention by his employers' research departments. [Trial at pp. 792–793, 831, 832]. Mecca's employers provided him with information on these securities, which he then dispersed to his customers. [Trial at pp. 784–785]. He never attempted to ascertain the accuracy of this information. [Trial at pp. 834–835]. Mecca obtained new customers by taking names from Dun & Bradstreet "lead" directories and cold calling up to 150 of these names per day. [Trial at pp. 813–815; Pl. Exh. 1101 at p. 82].

C. Yule

Yule, a graduate of Hofstra University with a bachelor's degree in business administration, is 26 years old. [Pl.Exh. 1201 at p. 5]. From in or about the end of 1987 to in or about May 1988, he worked in his first job in the securities industry as a registered representative at Sherwood's Long Island office. [Pl.Exh. 1201 at pp. 6–7]. From in or about May 1988 to in or about January 1990, Yule was a registered representative at J.T. Moran. [Pl.Exh. 1201 at p. 21]. Yule worked at the Long Island branch offices of Sherwood and J.T. Moran. [Pl.Exh. 1201 at pp. 8, 21–22]. From in or about June 1990 to in or about November 1990, he was a registered representative at Stuart–James. [Pl.Exh. 1201 at p. 72].

Yule earned approximately $35,000 in 1988, $90,000 in 1989 and $50,000 in 1990, in commissions from his customers' securities transactions. [Trial at p. 1015; Pl.Exh. 1201 at p. 110]. He specialized in the sale of "small capitalization stocks that had a higher risk in the market." [Pl. exh. 1201 at p. 35]. Yule primarily recommended securities to his customers that his employers had recommended to him. [Trial at pp. 933–935; Pl.Exh. 1201 at pp. 14, 27]. He received information about the securities he recommended to his customers from his employers, and then dispersed this information to customers without doing any research to verify its accuracy. [Pl.Exh. 1201 at pp. 16–17, 27, 29–30; Trial at pp. 935–36; *but see* Trial at pp. 997–1002]. While at J.T. Moran, Yule never recommended a stock based on his own research. [Pl.Exh. 1201 at p. 30].

Using the telephone book as a source of leads for potential customers, Yule cold called for customers. [Pl.Exh. 1201 at pp. 10, 24]. He made approximately 150 cold calls a day to prospective customers and used scripts when speaking to customers. [Pl.Exh. 1201 at pp. 10, 12, 24, 31].

## D. Vuono

Vuono, 25 years old, was employed as a registered representative at J.T. Moran's Long Island office from approximately December 1988 through January 1990. [Pl. Exh. 1301 at pp. 3–11]. Vuono had no stock market experience prior to working at J.T. Moran. [Pl.Exh. 1303 at p. 42]. He earned $75,000 in commission income in 1989. [Pl.Exh. 1301 at p. 13]. Vuono was subsequently employed as a registered representative at Prudential–Bache Securities, Inc., from in or about June 1990 to in or about January 1991.

From in or about December 1988 to in or about January 1990, Vuono typically cold-called 300 prospective customers per day at J.T. Moran. He found names and telephone numbers of these prospective clients from telephone books. [Pl.Exh. 1301 at p. 61].

During the first telephone call with any prospective customer, Vuono read from a script which described J.T. Moran. [Pl. Exh. 1303 at p. 7]. Vuono recommended that customers or prospective customers purchase only those securities that he was instructed to sell by J.T. Moran. [Pl.Exh. 1303 at pp. 17, 28, 56]. In this regard, he testified, "I was in the business for two months, I really didn't have a say of what I could recommend or what I could be doing. This is what I was told to do." [Pl.Exh. 1303 at p. 28]. He further testified, "I was in the business ... four months, I wasn't going to second-guess an analyst, that was his job. My job was to sell stock based on information provided to me by the analyst." [Pl.Exh. 1303 at p. 69].

Vuono learned about securities through J.T. Moran supervisors, the J.T. Moran research department, or through representatives of issuers of the securities recommended. J.T. Moran supervisors or the J.T. Moran research department passed out sales scripts to registered representatives with respect to particular issuers of securities. [Pl.Exh. 1303 at pp. 17, 26, 47, 50, 72]. Vuono used these sales scripts in presenting securities recommendations to customers. [Pl.Exh. 1303 at pp 17, 26, 47, 50, 72].[5]

Vuono did no independent research or analysis of the securities he recommended to customers. He based his recommendations solely on information received from J.T. Moran supervisors, from the J.T. Moran research department, and from representatives of issuers. [Pl.Exh. 1303 at pp. 26–28].

**5.** Vuono provided the SEC with sales scripts, which include the following language:

a. A script for Phonetel Technologies ("Phonetel") states, "Hello, ___, it's ___ from J.T. Moran! ... things developed much better than I had anticipated this weekend. What we have right now is a situation demonstrating explosive upside potential. I can tell you right now this is the type of stock that's going to be the foundation for a very profitable relationship!!! [Pl. Exh. 1402].

b. A script for Istec states, "ISTECH (sic) has the technology, the financing, and the management capabilities to support a VERY BIG PRICE!!!! There is one drawback, there is not a lot of stock available at this price and I would be very surprised if the stock is not bid well above the ne price today. LET'S PICK UP 10,-000 SHARES!!!!!!" [Pl.Exh. 1406].

c. A Healthcare Technologies ("Healthcare") script compared Healthcare to a company named Future Medical Products. According to the script Future Medical Products went public at $5 per share and "opened up at $17 the first day of trading." [Pl.Exh. 1403].

d. A second Healthcare script states, "I'm look for a one to two month holding period with returns up to 40–60%." [Pl.Exh. 1404].

e. A Phonetel script states, "GOD FORBID THE MARKET SHOULD GO UP ... THAN (sic) YOU WOULD SEE THE PHONETEL TRADE AS HIGH AS 15 x e OR $30 PER UNIT LONG TERM." [Pl.Exh. 1401].

f. A different Phonetel Script states, "The selling pressure that my company alone is going to exert on this issue is going to drive the price up within a very short period of time." [Pl.Exh. 1402].

g. A generic script states: "THIS IS GREAT THAT WE ARE GETTING STARTED WITH 5000 SHARES. BUT LET ME TELL YOU WHY I THINK WE SHOULD PICK UP 10000 SHARES. IF THIS STOCK JUST GOES FROM 2 TO 4, I CAN SELL 5000 SHARES AND GIVE YOU YOUR MONEY BACK AND YOU'LL STILL HAVE YOUR ORIGINAL INVESTMENT. LETS PULL DOWN 10000 SHARES. [Pl.Exh. 1409].

h. Another generic script states: "JOHN LETS (sic) SAY IM (sic) RIGHT ABOUT THIS STOCK AND IT GOES TO (2X) A SHARE. THAT'S 100% ON YOUR MONEY. THAT PROBABLY REPRESENTS THAT BIGGEST SCORE ON STOCKS IN YOUR LIFE ... JOHN, LETS (sic) MAKE THIS WORTH YOUR WHILE AND PULL DOWN ___ SHARES." [Pl.Exh. 1409].

Nor did Vuono independently confirm, investigative or analyze the accuracy of this information. In fact, he never knew whether the information about issuers was accurate. [Pl.Exh. 1303 at pp. 43, 45, 48, 51]. Vuono testified that he "took on faith" everything the research department told him. [Pl.Exh. 1303 at p. 43]. He further testified that he knew nothing about the J.T. Moran research department, including who worked there or what their investment background was. [Pl.Exh. 1303 at p. 101].

Vuono testified that, while at J.T. Moran, he determined a potential customer's financial condition, by inquiring how much he or she had available to invest. [Pl.Exh. 1303 at p. 13]. He testified that it was up to his customers to decide whether the purchase of a particular security comported with that customer's investment objectives. [Pl. Exh. 1303 at p. 52]. Vuono stated that, "if a client likes what I'm talking about, then he's going to get involved with it." [Pl. Exh. 1302 at p. 16]. He further stated that he did not make suitability determinations and that a customer's financial information "was filled out on the new account card, and once that went into operations and they executed the order, obviously they felt it was suitable because everything was on the account form." [Pl.Exh. 1302 at pp. 16–17].

Vuono testified that he was not aware of suitability requirements for clients who wished to trade on margin. He further testified that he was not involved in the determination of customer suitability for margin trading. Vuono stated that, "Everything was made in the back office. I mean, the client would not apply to be on margin, so if it was approved, it was approved. If it wasn't, then it wasn't. And I'm not sure who made the determination. It was all sent to New York." [Pl.Exh. 1302 at pp. 17–18].

## III. Customer Witnesses

### A. Ben Hasho's Customers

#### 1. Benjamin Tate

Benjamin Tate ("Tate"), a high school graduate, is 69 years old. [Trial at p. 648, 650]. Tate is the President of a music publishing company and assists in managing a shopping mall in Newark, New Jersey. [Trial at p. 648]. He earns between $18,000 and $22,000 per year. [Trial at p. 649].

In or about August 1989, Tate was called by Ben Hasho. Tate, who had no knowledge of Ben Hasho prior to this call, had no investing experience prior to investing with Ben Hasho at J.T. Moran, and informed Ben Hasho of this fact. [Trial at p. 650–51]. In their first telephone conversation, Ben Hasho told Tate that J.T. Moran "had been in business for over 52 years." [Trial at p. p. 651]. While Tate lost approximately $2,000 through investing with Ben Hasho, Ben Hasho earned approximately $262.50 in commission income through trading in Tate's account. [Trial at p. 661; Pl.Exh. 2801 at ¶ 10.b.3].

#### 2. Dixon Leatherbury

Dixon Leatherbury ("Leatherbury") is a resident of Machipongo, Virginia. [Pl.Exh. 1002 at p. 4]. He is 40 years old and is the President of a farm equipment sales business. [Pl.Exh. 1002 at pp. 6–7]. Leatherbury was first called by Ben Hasho in or about July 1989. [Pl.Exh. 1002 at pp. 6–7]. Leatherbury lost approximately $10,000 through investing with Ben Hasho. [Pl. Exh. 1002 at pp. 25–26]. Ben Hasho earned approximately $1,450 in commission income through trading in Leatherbury's account. [Pl.Exh. 2801 at ¶ 10.b.1]

#### 3. Richard Poff

Richard Poff ("Poff"), a resident of Salem, Virginia, is the part-owner of a gasoline station. [Pl.Exh. 1003 at p. 4]. Poff, who has a high school equivalency degree, earned approximately $54,000 in 1989. [Pl. Exh. 1003 at p. 5]. In or about April 1989, Poff received his first phone call from Ben Hasho. Poff had no knowledge of Ben Hasho prior to this phone call. [Pl.Exh. 1003 at p. 7].

In the first telephone call, Ben Hasho told Poff that J.T. Moran was "an old es-

tablished company with a very good reputation." [Pl.Exh. 1003 at p. 7]. Ben Hasho further expressed confidence that the stocks he recommended would increase in value so much that Poff's portfolio would be worth in excess of "$100,000, or six figures" in a short time. [Pl.Exh. 1003 at p. 10]. Ben Hasho never asked Poff about his financial objectives. During the first conversation, Poff told Ben Hash that he had never invested in anything but "bank stocks" and that he had never been involved in the equities market. [Pl.Exh. 1003 at pp. 10–11].

Poff borrowed $45,000 from a bank to finance stock purchases through Ben Hasho. [Pl.Exh. 1003 at p. 21]. When Poff told Ben Hasho that he had to borrow money to finance securities purchases, Ben Hasho assured Poff that borrowing was a "good move" because the recommended securities would increase in price. [Pl.Exh. 1003 at p. 21]. At times, Ben Hasho recommended that Poff borrow additional money to finance securities purchases. Ben Hasho stated that, "if you don't have the money, this stock is so good, its so great, borrow the money. Go borrow the money. If you have to borrow the money, do what you have to do to get this stock because its going through the roof." [Pl.Exh. 1003 at p. 22].

Poff lost approximately $70,000 through investing with Ben Hasho. [Pl.Exh. 1003 at p. 35]. Ben Hasho earned approximately $15,610.50 in commission through trading in Poff's account. [Pl.Exh. 2801 at ¶ 10.b.6].

### 4. *Frank Cardillo*

Frank Cardillo ("Cardillo") is 40 years old and a resident of North Babylon, New York. [Trial at p. 123]. As President of Ace Canvas and Tent Corp., a party tent manufacturer, Cardillo earns approximately $40,000 per year. [Trial at p. 124]. In 1988, Ben Hasho became Cardillo's registered representative at J.T. Moran. [Trial at p. 125]. Cardillo lost approximately $6,500 through investing with Ben Hasho, who earned approximately $1,003.75 in commission income from trades in Cardil-

lo's account. [Trial at p. 131; Pl.Exh. 2801 at ¶ 10.b.2.].

### 5. *Leonard Tlusty*

Leonard Tlusty ("Tlusty") is 65 years old and a resident of Alexandria, Virginia. [Pl. Exh. 1005 at p. 4]. He is a retired school teacher. [Pl.Exh. 1005 at p. 4]. Ben Hasho first called Tlusty on or about September 28, 1989. Tlusty had no knowledge of Ben Hasho prior to this telephone call. [Pl.Exh. 1005 at p. 4]. Tlusty lost approximately $6,000 through investing with Ben Hasho, while Ben Hasho earned approximately $953.50 in commission income from trades in Tlusty's account. [Pl.Exh. 1005 at p. 28; Pl.Exh. 2801 at ¶ 10.b.5].

### 6. *Rosario Como*

Rosario Como ("Como") is 26 years old and a resident of Port Charlotte, Florida. [Pl.Exh. 1004 at p. 3]. Como was born in Italy and arrived in this country in 1971. [Pl.Exh. 1004 at p. 5]. Como has a high school education. [Pl.Exh. 1004 at p. 5]. Although Como currently earns approximately $300 a week, Como was earning approximately $400 when Ben Hasho became Como's registered representative. [Pl.Exh. 1004 at pp. 6, 8]. Ben Hasho first called Como in or about October 1986, while working as a registered representative at First Jersey. [Pl.Exh. 1004 at pp. 7–8].

Ben Hasho indicated on Como's new account form that Como earned $60,000 per year even though Como told Ben Hasho that he earned far less. [Pl.Exh. 1004 at p. 11]. During one of their first conversations, Como told Ben Hasho that he "wanted a safe portfolio." [Pl.Exh. 1004 at p. 10]. Ben Hasho earned approximately $1,043.12 in commission income from trades in Como's account during the period of September 1987 to mid-January 1990, while Como lost approximately $25,000 through investing with Ben Hasho. [Pl. Exh. 2801 at ¶ 10.b.4; Pl.Exh. 1004 at 41].

### 7. *Francesco Piteo*

Francesco Piteo ("Piteo") is 30 years old and resides in Brooklyn, New York. [Trial

at p. 138]. He is Vice President of a trunk making company and earns approximately $350 per week. [Trial at pp. 138–139]. Piteo, who has a high school equivalency degree, was born in Italy and arrived in this country approximately five years ago. [Trial at 139]. Piteo first spoke to Ben Hasho in or about June 1990, when Ben Hasho was a registered representative at Stuart–James. [Trial at pp. 140, 142]. During this first telephone call, Piteo told Ben Hasho, "I would like to invest. You know, I don't know nothing about the stock market ... If you have something for me, you can introduce me ... look, I don't know anything. I never made an investment like this in my whole life." [Trial at p. 140]. Piteo lost approximately $5,500 through investing with Ben Hasho. [Trial at p. 148].

## B. Mecca's Customers

### 1. *Ronald Costa*

Ronald Costa ("Costa"), 29 years old, is a resident of Westbury, New York, and works as an engineer for Grumman Aircraft Systems. [Trial at p. 24]. From in or about 1986 through 1990, Costa's yearly income has ranged from $27,000 to $35,000 per year. [Trial at p. 241]. From in or about mid–1986 to in or about mid–1987, Costa maintained an account at First Jersey. During this period, Costa's account was serviced by a registered representative other than Mecca. [Trial at p. 242]. Costa had no investment experience prior to the opening of his First Jersey account. [Trial at p. 242]. He found his account statements confusing. [Trial at p. 267].

In or about 1987, Mecca called Costa and informed him that he was replacing Costa's previous registered representative. [Trial at p. 243]. During their first conversation, Mecca did not ask Costa about his investment objectives. [Trial at p. 243]. Mecca never asked Costa about his investment background. [Trial at p. 243].

While Costa lost approximately $40,000 through investing with Mecca, Mecca earned approximately $12,462.83 in commission income through trading in Costa's

account at Sherwood and J.T. Moran. [Trial at p. 258; Pl.Exh. 2801 at ¶ 10.c.1].

### 2. *Ralph Lambiase, Jr.*

Ralph Lambiase, Jr. ("Lambiase"), age 35, is a resident of Bayshore, New York, and is the owner of Call Me Electric, Inc. [Trial at p. 559]. Lambiase, a high school graduate, is an electrician who runs a business from his home. [Trial at p. 560]. His annual income since 1988 has been $28,000. [Trial at p. 560]. Lambiase opened an account at Sherwood in or about 1988 through a registered representative other than Mecca. [Trial at pp. 560–562]. Before opening an account at Sherwood, Lambiase had no prior investing experience. [Trial at pp. 560–562].

In or about February 1989, Mecca became Lambiase's registered representative at J.T. Moran. [Trial at pp. 561–562, 696–697]. Lambiase testified that he had trusted Mecca because he "figured he was my broker and that he would do the right thing for me ... I trusted him to do what he thought was right." [Trial at p. 577]. During their first telephone conversation, Mecca never asked Lambiase about his investment experience, educational background or investment objectives. [Trial at p. 563]. However, during this telephone conversation, Mecca did tell Lambiase that he had "hot" stocks for Lambiase to invest in. [Trial at p. 564]. Mecca earned approximately $1,077.51 in commission income from trades in Lambiase's account. [Pl. Exh. 2801 at P 10.c.4].

### 3. *Albert Natoli*

Albert Natoli ("Natoli"), age 41, is an attorney who resides in Brooklyn, New York. [Trial at p. 609]. In or about mid–1988, Natoli was cold called by a J.T. Moran employee who introduced the firm to Natoli. [Trial at p. 610]. Several weeks later, Mecca called Natoli to introduce himself. [Trial at p. 610]. During this conversation, Mecca told Natoli that "J.T. Moran had a very good track record with small stocks." [Trial at p. 610]. Mecca also told Natoli that J.T. Moran had "a record of doing better for its clients than the rest of

the brokerage houses around," and that he would make a lot of money. [Trial at pp. 610–611].

While Natoli lost approximately $3,700 through investing with Mecca, Mecca earned approximately $1,077.51 in commission income through trading in Natoli's account. [Trial at p. 623; Pl.Exh. 2801 at ¶ 10.c.3.].

#### 4. *Harry Alexander*

Harry Alexander, Jr. ("Alexander"), age 44, lives in Harrisburg, Pennsylvania, and owns AR Tooling & Precision Machining. He graduated from high school and has two years of college education. [Pl.Exh. 1102 at p. 5]. In 1989, he earned approximately $30,000. [Pl.Exh. 1102 at p. 6].

In or about April 1989, Alexander was contacted by Mecca and, soon thereafter, opened an account at J.T. Moran. [Pl.Exh. 1102 at pp. 9–10]. At this time, Mecca told Alexander that J.T. Moran had a good track record and that in seven or eight years in the business he had never been involved in stocks that performed poorly. [Pl.Exh. 1102 at p. 10].

During this first conversation, Alexander told Mecca that he had no prior investment history. [Pl.Exh. at 1101 at p. 11]. On a number of occasions, Mecca told Alexander, "Let me worry about the market. I know what's going on and you don't." [Pl. Exh. 1102 at p. 22]. When Alexander expressed concern over fluctuations in the price of his American Network holding purchased on Mecca's recommendation, Mecca said, "don't worry about it . . . What you saw . . . was . . . an older price, and . . . the price today is higher than that." [Pl.Exh. 1102 at p. 22].

While Alexander lost approximately $9,000 through investing with Mecca, Mecca earned approximately $1,655.79 in commission income from trades in Alexander's account. [Pl.Exh. 1101 at p 41; Pl.Exh. 2810 at ¶ 10.c.2.].

#### 5. *Peter Cherouvis*

Peter Cherouvis ("Cherouvis"), age 34, resides in Rocky Point, New York, where he is a mechanic and owns an auto repair shop. [Trial at pp. 163–164]. Cherouvis has a high school education. [Trial at p. 164]. In or about September 1986, Cherouvis was contacted by Mecca and soon thereafter opened an account at First Jersey. [Trial at pp. 166–167]. Prior to investing through Mecca, Cherouvis' only investment experience had been in the silver market in 1980. [Trial at 164].

During their first telephone conversation, Mecca told Cherouvis that First Jersey was a reputable stockbroker that did a lot of research and made excellent recommendations. [Trial at p. 167]. During this conversation, Mecca also told Cherouvis that he could recommend securities on which Cherouvis' could make returns of 100% to 200%. Subsequently, Cherouvis' account was transferred to Sherwood and then to J.T. Moran. Cherouvis put his faith in Mecca. [Trial at p. 181].

Mecca's statements about the value of Cherouvis' securities did not reflect the securities values contained on Cherouvis' customer statements. [Trial at p. 187]. In addition, Mecca assured Cherouvis that the prices of his holdings were actually higher than any values reflected on Cherouvis' customer statements. [Trial at p 236].

Cherouvis lost approximately $80,000 through investing with Mecca, and owes $42,000 for loans he obtained to finance securities purchases through Mecca. As a result of losses on investments recommended by Mecca, Cherouvis also lost a service station business because he became unable to pay the station's bills. [Trial at p. 189]. Mecca earned approximately $6,640.56 in commission income from trades in Cherouvis' account while at Sherwood and J.T. Moran. [Pl.Exh. 2801 at ¶ 10.c.5.].

#### 6. *Carroll J. Bryla*

Carroll J. Bryla ("Bryla"), age 40, is an attorney who resides in Fredericksburg, Texas. [Pl.Exh. 1103 at p. 5]. In or about mid–1990, Mecca cold called Bryla and introduced himself as a registered representative for Stuart–James. [Pl.Exh. 1103 at p. 16]. In or about July 1990, Bryla opened

an account at Stuart–James. [Pl.Exh. 1103 at p. 21].

## C. Yule's Customers

### 1. *John Meyers*

John Meyers ("Meyers"), age 43, is a resident of Silver Spring, Maryland, and is the President of a home improvement company. [Trial at p. 56]. He approximate annual income is $40,000. [Trial at p. 56]. Yule first called Meyers in or about August 1989. [Trial at p. 57]. Meyers had no investing history prior to investing with Yule at J.T. Moran. [Trial at p. 56]. Meyers explained his lack of investing experience to Yule. [Pl.Exh. 1202 at p. 6]. Yule never asked Meyers about his investment goals, assets or income. [Pl.Exh. 1202 at pp. 13–14].

Meyers lost approximately $6,000 through investing with Yule. [Trial at p. 70]. Yule earned approximately $890 in commission income from trades in Meyers' account. [Pl.Exh. 2801 at ¶ 10.d.6].

### 2. *Rodney Sensibaugh*

Rodney Sensibaugh ("Sensibaugh") is a resident of Fairfax Station, Virginia. [Pl.Exh. 1203 at p. 5]. He is a branch manager for Thomas Summerville, a plumbing supply wholesaler. [Pl.Exh. 1203 at pp. 7–8]. Yule first called Sensibaugh in or about July 1989. [Pl.Exh. 1203 at p. 8]. During the first telephone call, Yule told Sensibaugh that he worked for J.T. Moran, "a leading Wall Street firm and one of the leading investment companies." [Pl.Exh. 1203 at p. 8]. Sensibaugh had no knowledge of Yule prior to this phone call. [Pl.Exh. 1203 at p. 8].

Prior to investing with Yule at J.T. Moran, Sensibaugh had only invested in IRAs and mutual funds. [Pl.Exh. 1203 at p. 9]. Sensibaugh informed Yule about his limited investing history. [Pl.Exh. 1203 at p. 10]. Sensibaugh also informed Yule that he would have to borrow money from a credit line against his house to finance stock purchases. [Pl.Exh. 1203 at pp. 10, 13, 32].

Sensibaugh lost approximately $20,000 through investing with Yule. [Pl.Exh. 1203 at p. 29]. Yule earned approximately $4,067.51 in commission income from trades in Sensibaugh's account. [Pl.Exh. 2801 at ¶ 10.d.3.].

### 3. *J. Lawrence Hirsch*

J. Lawrence Hirsch ("Hirsch"), age 36, resides in Alexandria, Virginia, and owns a firm that designs and builds homes. [Pl. Exh. 1204 at p. 4, 7]. Yule cold called Hirsch in or about January 1989. [Pl.Exh. 1204 at p. 9].

Hirsch informed Yule that he would have to borrow money to buy securities, and ultimately borrowed money on a home equity loan for this purpose. [Pl.Exh. 1204 at p. 12]. While Hirsch lost approximately $40,000 through investing with Yule, Yule earned approximately $8,180.77 in commission income from trades in Hirsch's account. [Pl.Exh. 1204 at p. 20; Pl.Exh. 2801 at ¶ 10.d.4].

### 4. *Lyle Garrette, Jr.*

Lyle Garrette, Jr. ("Garrette"), age 48, resides in Amherst, Virginia, and works as a civil engineer. [Pl.Exh. 1205 at p. 5, 6]. Yule first contacted Garrette in or about July 1989. [Pl.Exh. 1205 at p. 7]. Garrette borrowed money to finance some of his stock purchases through Yule, and he informed Yule that he was borrowing money to finance his securities purchases at J.T. Moran. [Pl.Exh. 1205 at p. 17]. Yule told Garrette that he was making a six digit salary based on his stock recommendations to customers, even though Yule never made a six digit salary as a registered representative. [Pl.Exh. 1205 at pp. 18–19; Trial at p. 1015; Pl.Exh. 1201 at p. 110].

While Garrette lost approximately $12,000 through investing with Yule, Yule earned approximately $1,687.50 in commission income from trades in Garrette's account. [Pl.Exh. 1205 at p. 28; Pl.Exh. 2801 at ¶ 10.d.5].

### 5. *Anthony Caulfield*

Anthony Caulfield ("Caulfield"), age 51, is a carpenter. [Trial at p. 92]. Caulfield

earns approximately $30,000 per year. [Trial at p. 92]. Yule first called Caulfield in or about the Spring of 1989. Caulfield had no knowledge of Yule prior to this call. [Trial at p. 92]. During this first telephone call, Yule told Caulfield that J.T. Moran was "a well-respected Wall Street firm" and "one of the largest on the street." [Trial at p. 92]. While Caulfield lost approximately $9,000 through investing with Yule, Yule earned approximately $1,056.56 in commission income from trades in Caulfield's account. [Trial at p. 106; Pl.Exh. 2801 at ¶ 10.d.2].

### 6. *Andrew Steel*

Andrew Steel ("Steel"), a resident of Winchester, Virginia, is a restaurant owner. [Pl.Exh. 1206 at p. 5]. In 1989, Steel made approximately $30,000. [Pl.Exh. 1206 at p. 5]. Yule first called Steel on or about December 21, 1989. [Pl.Exh. 1205 at p. 8]. Yule never asked Steel about his previous investing history, his income or investing goals. [Pl.Exh. 1206 at pp. 10–13]. Steel's only prior investment experience was in "bank stocks" given to him by his father-in-law. [Pl.Exh. 1206 at p. 10]. While Steel lost approximately $13,000 through investing with Yule, Yule earned approximately $2,430 in commission income from trades in Steel's account. [Pl.Exh. 1206 at pp. 25–26; Pl.Exh. 2801 at ¶ 10.d.1].

### 7. *Conrad Snedegar*

Conrad Snedegar ("Snedegar"), age 63, is a resident of Baltimore, Maryland. [Pl.Exh. 1207 at p. 3]. Snedegar is a masonry worker who earned an income of approximately $35,000 in 1990. [Pl.Exh. 1207 at p. 4]. Yule first called Snedegar in or about July or August 1990. [Pl.Exh. 1207 at p. 4]. During this call, Yule requested that Snedegar transfer his account from J.T. Moran to Stuart–James where Yule then worked. [Pl.Exh. 1207 at p. 5]. When Snedegar mentioned to Yule that he had a negative investing experience at J.T. Moran, Yule spoke badly of J.T. Moran and told Snedegar that Stuart–James was a much better company. [Pl.Exh. 1207 at p. 7]. Snedegar also told Yule that he had lost approximately $300,000 investing at J.T.

Moran. [Pl.Exh. 1207 at pp. 8–9]. Yule replied that Snedegar could recoup these losses by investing through Yule at Stuart–James. Snedegar informed Yule that he only had a twelfth grade education. [Pl. Exh. 1207 at p. 8]. [Pl.Exh. 1207 at p. 9]. Snedegar had to ask Yule several times whether he worked at J.T. Moran before Yule would admit it. [Pl.Exh. 1207 at p. 9]. Snedegar lost approximately $30,400 through investing with Yule. [Pl.Exh. 1207 at pp. 31–32].

### D. Vuono's Customers

### 1. *Timothy W. St. Clair*

Timothy W. St. Clair ("St. Clair"), a resident of Blue Point, New York, owns a boat repair service. [Pl.Exh. 1304 at p. 10]. Vuono cold called St. Clair in or about February 1989 and soon thereafter St. Clair opened an account at J.T. Moran. [Trial at pp. 403, 457]. St. Clair is not a college graduate. [Pl.Exh. 1304 at p. 10].

Prior to investing through Vuono, St. Clair had invested only several thousand dollars in securities through Prudential–Bache. [Pl.Exh. 1304 at pp. 10–11, 199]. Prior to investing through Vuono, St. Clair did not know the meaning of an "over-the-counter security," a "market maker," or a "bid or ask price." [Trial at pp. 403–404]. St. Clair's investment objective was "slow secure growth." [Trial at p. 405]. St. Clair trusted Vuono to provide him with accurate information about securities, and relied upon Vuono because he considered Vuono to be a "licensed professional." [Trial at pp. 409, 427; Pl.Exh. 1304 at pp. 37, 44, 174–75]. St. Clair had trouble understanding his customer account statement and relied upon Vuono to decipher them "honestly." [Trial at pp. 418, 492–494; Pl.Exh. 1304 at pp. 92–95, 99–100, 196].

While St. Clair lost approximately $30,-000 to $40,000 through investing with Vuono, Vuono earned approximately $18,690.63 in commission income through trading in St. Clair's account. [Trial at p. 433; Pl. Exh. 2801 at ¶ 10.h].

### 2. Jeffrey Conte

Jeffrey Conte ("Conte"), a resident of Huntington Station, New York, is a technical writer. Vuono cold called Conte in or about March 1989 and soon thereafter Conte opened an account at J.T. Moran. [Pl.Exh. 1305 at p. 1–10]. Vuono never asked Conte about his investment objectives. [Pl.Exh. 1305 at pp. 15–16]. Conte lost approximately $3,500 through investing with Vuono. [Pl.Exh. 1305 at p. 31]. Vuono earned approximately $1,137.84 in commission income from trades in Conte's account. [Pl.Exh. 2801 at ¶ 10.h.3.].

### 3. Italo Guggino

Italo Guggino ("Guggino"), a resident of Merrick, New York, owns a pizzeria. Vuono cold called Guggino in or about January 1989 and soon thereafter Guggino opened an account at J.T. Moran. [Pl.Exh. 1306 at pp. 11–12]. Guggino had attended one semester of college. [Pl.Exh. 1306 at p. 6].

Guggino had no experience in the stock market prior to investing through Vuono. [Pl.Exh. 1306 at p. 11]. In this regard, Guggino testified that before investing with Vuono was "illiterate to the whole thing, and I still am." [Pl.Exh. 1306 at p. 11]. Guggino testified that he trusted Vuono because he was Italian. [Pl.Exh. 1305 at p. 17]. Guggino also testified that when he looked at the literature Vuono provided about issuers, "I was trying to read it, but I couldn't make any heads or tails out of it. You know, I still don't. Give me a prospective (sic) now, I still ain't going to tell you what's going on there." [Pl.Exh. 1306 at pp. 22–23]. Guggino relied upon Vuono to decipher his customer statements. [Pl. Exh. 1306 at pp. 56–57].

While Guggino lost approximately $1,300 through investing with Vuono, Vuono earned approximately $460.94 in commission income from trades in Guggino's account. [Pl.Exh. 1306 at pp. 32–33; Pl.Exh. 2801 at ¶ 10.h.4.].

### 4. Jonathan Treat

Jonathan Treat ("Treat"), a resident of Bolton, Connecticut, is a farmer. [Trial at p. 292; Pl.Exh. at p. 292]. In or about the summer of 1989, Vuono became Treat's registered representative at J.T. Moran, replacing Treat's previous J.T. Moran broker. [Trial at p. 297; Pl.Exh. 1307 at p. 26]. Treat had limited investment experience prior to investing through Vuono. [Trial at p. 293; Pl.Exh. 1307 at pp. 5–16]. Prior to investing through Vuono, Treat did not know the meaning of a market maker or a bid and ask price.

Treat lost approximately $140,000 through investing with Vuono. [Trial at p. 325]. Vuono earned approximately $25,-153.60 in commission income from trades in Treat's account. [Pl.Exh. 2801 at ¶ 10.h.1.].

### 5. Kenneth C. Beck

Kenneth C. Beck ("Beck"), a resident of Cherry Hill, New Jersey, is a salesman. Vuono cold called Beck in or about August 1989 and soon thereafter Beck opened an account at J.T. Moran. [Pl.Exh. 1308 at p. 8]. Beck lost approximately $440 through investing with Vuono. [Pl.Exh. 1308 at p. 19]. Vuono earned approximately $156.25 in commission income from trades in Beck's account. [Pl.Exh. 2801 at ¶ 10.h.2].

### IV. House Stocks

While working for First Jersey, Sherwood and/or J.T. Moran, Ben Hasho, Mecca, Yule and Vuono recommended to numerous customers, and potential customers, that they purchase certain over-the-counter securities issued by unseasoned companies with low revenues and negative earnings. These securities were "house stocks."

J.T. Moran and Sherwood split with its registered representatives an average gross commission of 24% of the purchase price of these stocks.[6] Therefore, Sherwood and J.T. Moran registered representatives received an average of 12% of the customer's purchase price as net commis-

---

6. Due to lack of documents, the SEC was unable to determine average commissions earned at

First Jersey.

sion on Sherwood and J.T. Moran house stock sales. [Pl.Exh. 2801 at ¶¶ 4–11]. However, such commissions ranged as high as 25%. [Trial at pp. 847–848, 1017].

With one exception, the SEC profiled only J.T. Moran house stocks because these securities constitute the bulk of the securities recommended to the customer witnesses in this case. The house stocks recommended by J.T. Moran registered representatives included the following, [Trial at pp. 816–817; Pl.Exh. 1101 at pp. 65–67]:

#### A. J.T. Moran Financial

J.T. Moran Financial, a Delaware corporation, went public in or about August 1987. [Pl.Exh. 1801 at p. 9]. In a prospectus dated October 1988, J.T. Moran Financial disclosed that its securities "involve a high degree of risk." [Pl.Exh. 1801 at p. 1]. J.T. Moran Financial lost $4,865,320 and $4,160,446, on revenues of $9,238,396 and $38 million in 1988 and 1989, respectively. [Pl.Exh. 1801 at p. 23; Pl.Exh. 1806 at p. 41]. J.T. Moran Financial securities were traded over-the-counter and quoted on the National Association of Securities Dealers Automated Quotation System ("NASDAQ"). [Pl.Exh. 2601 at pp. 1155–1156]. In the following time periods, the highest bid price for J.T. Moran Financial common stock was:

(1) $6¼ during 1987;

(2) $6 during 1988;

(3) $5¼ during 1989;

(4) $2⅛ from January 1, 1990 to July 1, 1990; and

(5) As of October 2, 1990, the highest bid listed for this stock was $.01 per share. [Pl.Exh. 2601 at pp. 1155–1156; Pl.Exh. 2701 at p. 134].

#### B. International Bankcard Services Corp.

International Bankcard Services Corp. ("International Bankcard") located in Syosset, New York, is a Delaware corporation that was established in 1986. [Pl.Exh. 1701 at p. 3]. The company markets credit cards and consumer services to "affinity groups," organizations based on the common interests of their members. [Pl.Exh. 1701 at p. 3]. International Bankcard went public in or about September 1987. [Pl.Exh. 1703 at p. 10]. International Bankcard's prospectus dated September 3, 1987, states that the firm's securities are "speculative and involve a high degree of risk." The prospectus further indicates that International Bankcard securities should "only be purchased by persons who could afford to lose their entire investment." [Pl.Exh. 1701 at p. 2]. International Bankcard had losses of $518,339 and $831,471 on revenues of $84,726 and $307,753 for 1988 and 1989, respectively. [Pl.Exh. 1703 at p. 30; Pl.Exh. 1706 at p. 30]. International Bankcard's Form 10–K for the year that ended April 30, 1988, describes International Bankcard as a "development stage company." [Pl.Exh. 1703 at p. 30]. International Bankcard securities are traded over-the-counter and, for most or all of the relevant time period, have been quoted NASDAQ. [Pl.Exh. 2601 at p. 923]. In the following time periods, the highest bid price for International Bankcard common stock was:

(1) $1 for 1987;

(2) $1 for 1988;

(3) $1⅞ for 1989;

(4) $¼ from January 1, 1990 to July 1, 1990; and

(5) As of October 2, 1990, the closing bid price for this stock was $1/32. [Pl. Exh. 2601 at p. 923; Pl.Exh. 2602 at p. 878; Pl.Exh. 2701 at p. 106].

#### C. EMS systems Ltd.

EMS systems Ltd. ("EMS") is a Canadian corporation that was established in August 1968. EMS is currently located in Carrollton, Texas. [Pl.Exh. 1905 at p. 2]. EMS is engaged in the research, design, manufacture and marketing of electronic products for the computer and communications industry. [Pl.Exh. 1905 at p. 3]. EMS lost $2,771,471 and $1,163,087 on revenues of $6,483.340 and $4,041,920 for 1988 and for the nine months ending September 30, 1989, respectively. [Pl.Exh. 1905 at p. 43; Pl.Exh. 1908 at p. 6]. EMS securities are traded over-the-counter and, for most or all of the relevant time period, have been quot-

ed on NASDAQ. [Pl.Exh. 2601 at p. 545; Pl.Exh. 2602 at p. 503]. In the following time periods, the highest bid price for EMS common stock was:

(1) $3 for 1987;

(2) $2⅞ for 1988;

(3) $2 for 1989;

(4) $1¹⁵⁄₁₆ from January 1, 1990 to July 1, 1990; and

(5) As of October 2, 1990, the highest bid price listed for this stock was $.0025. [Pl.Exh. 2601 at p. 545; Pl.Exh. 2602 at p. 503; Pl.Exh. 2701 at p. 65].

## D. Advanced Products & Technologies, Inc.

Advanced Products & Technologies, Inc. ("Advanced Products") is a Washington corporation based in Redmond, Washington. Advanced Products designs, develops, manufactures and markets "travel oriented" consumer and industrialized products. [Pl.Exh. 2207 at pp. 1, 4]. Advanced Products went public in or about December 1986. [Pl.Exh. 2602 at p. 24]. An Advanced Products prospectus dated June 1989, indicates that "the company's securities involve a high degree of risk, including the company's need for immediate additional working capital to sustain operations." [Pl.Exh. 2207 at p. 5]. Advanced Products lost $1,795,824 and $1,608,381 on revenues of $1,540,726 and $567,137 for 1988 and for the nine months ending September 30, 1989, respectively. [Pl.Exh. 2205 at p. 25; Pl.Exh. 2209 at p. 4]. Advanced Products is an over-the-counter security that, for most or all of the relevant time period, was quoted on NASDAQ. [Pl.Exh. 2602 at p. 24]. In the following time periods, the highest bid price for Advanced Products common stock was:

(1) $3¼ for 1988;

(2) $2½ for 1989;

(3) $1⁹⁄₃₂ from January 1, 1990 to July 1, 1990; and

(4) As of October 2, 1990, the highest bid price listed for this stock was $.02 [Pl.Exh. 2602 at p. 24; Pl.Exh. 2701 at p. 5].

## E. American Network

American Network is a Delaware corporation that commenced operations in 1984. [Pl.Exh. 2301 at p. 6]. The company's main offices are located in Tennessee, Kentucky, and South Carolina. [Pl.Exh. 2301 at p. 6]. American Network went public in or about January 1989. [Pl.Exh. 2301]. American Network's prospectus dated January 24, 1989, states that the "securities offered hereby involve a high degree of risk." [Pl. Exh. 2301 at p. 1]. American Network had profits of $24,137 and $8,291 on revenues of $4,533,224 and $4,688,344 for 1988 and 1989, respectively. [Pl.Exh. 2301 at p. 5; Pl.Exh. 2306 at p. 19]. American Network is an over-the-counter security that, for most or all of the relevant time period, was quoted on NASDAQ. [Pl.Exh. 2602 at p. 74]. In the following time periods, the highest bid price for American Network common stock was:

(1) $2½ during 1989;

(2) $2⅛ from January 1, 1990 to July 1, 1990; and

(3) The closing bid price for this stock was $⅛ as of October 2, 1990. [Pl. Exh. 2602 at p. 74; Pl.Exh. 2701 at p. 3].

## F. Phonetel Technologies, Inc.

Phonetel Technologies, Inc. ("Phonetel") is an Ohio corporation located in Cleveland, Ohio, that went public in or about January 1988. [Pl.Exh. 1602 at p. 3]. The company engages in, among other things, pay telephone vending and sales. [Pl.Exh. 1602 at p. 3]. Phonetel offering documents, dated September 1988 and November 1989, state that the company's securities are "speculative and involve a high degree of risk." [Pl.Exh. 1602 at p. 3; Pl.Exh. 1603 at p. 5]. These same documents identify Phonetel as a "developmental stage company." [Pl. Exh. 1602 at p. 53; Pl.Exh. 1608 at p. 94]. Phonetel lost $783,114 on revenues of $2,246,397 in 1988. [Pl.Exh. 1605 at p. 15]. Phonetel is an over-the-counter security that, for most or all of the relevant time period, was quoted on NASDAQ. [Pl.Exh. 2602 at p. 1297]. In the following time

periods, the highest bid price for Phonetel common stock was:

(1) $3 during 1988;

(2) $4⅛ during 1989;

(3) $4½ from January 1, 1990 to July 1, 1990; and

(4) The closing bid price for this stock was $7/16 as of October 2, 1990. [Pl. Exh. 2602 at p. 1297; Pl.Exh. 2701 at p. 157].

### G. Istec

Istec, an Israeli corporation located in Ramat Gan, Israel, is involved in the design, development, manufacture and marketing of products involving various technologies "which have been or are being developed by Israeli universities and scientific institutions with the aim of creating export oriented products." [Pl.Exh. 2101 at p. 6]. Istec's prospectus dated September 1, 1987 discloses that the company's securities involve "a high degree of risk." [Pl.Exh. 2101 at p. 1]. Istec lost $4.1 million in 1988 on revenues of $1.1 million. [Pl.Exh. 2105 at p. 6]. Istec is an over-the-counter security that, for most or all of the relevant time period, was quoted on NASDAQ. [Pl.Exh. 2602 at p. 903]. In the following time periods, the highest bid price for Istec common stock was:

(1) $4 during 1988;

(2) $4⅛ during 1989;

(3) $4⅛ from January 1, 1990 to July 1, 1990; and

(4) The closing bid price for this stock was $9/32 as of October 2, 1990. [Pl. Exh. 2602 at p. 903; Pl.Exh. 2701 at p. 109].

### H. Healthcare Technologies Ltd.

Healthcare Technologies Ltd. ("Healthcare"), an Israeli company, located in Ramat Gan, Israel, was incorporated in May 1988 in connection with the corporate restructuring of Istec. Prior to going public in February 1989, Healthcare was a wholly owned subsidiary of Istec. The company is engaged in the development, manufacture and marketing of laboratory medical diagnostic kits for the detection of diseases and in the research and development of "blood treatment systems." [Pl.Exh. 2001 at pp. 4, 7]. The company's prospectus dated February 15, 1989, indicates that this offering "involves a high degree of risk." [Pl. Exh. 2001 at p. 1]. The company had losses of $403,977 and $379,872 on revenues of $635,731 and $494,561 for 1987 and 1988, respectively. [Pl.Exh. 2001 at p. 5]. Healthcare is an over-the-counter security that, for most or all of the relevant time period, was quoted on NASDAQ. [Pl.Exh. 2602 at p. 795]. In the following time periods, the highest bid price for Healthcare common stock was:

(1) $2⅝ during 1989;

(2) $1⅞ from January 1, 1990 to July 1, 1990; and

(3) The closing bid price for this stock was $¼ as of October 2, 1990. [Pl. Exh. 2602 at p. 795; Pl.Exh. 2602 at p. 795; Pl.Exh. 2701 at p. 95].

### I. Med–Mobile, Inc.

Med–Mobile, Inc. ("Med–Mobile"), later known as Bio–Reference Laboratories, Inc. ("Bio–Reference"), is a New Jersey corporation located in Elmwood Park, New Jersey. Since February 1987, the firm has been engaged primarily in the operation of a clinical laboratory in New Jersey. With the discontinuance of its mobile examination division in June 1989, the firm changed its name from Med–Mobile to Bio–Reference. Med–Mobile/Bio Reference provides diagnostic medical testing for physicians, hospitals, clinics and other health facilities. [Pl.Exh. 2418 at p. 7]. The company's December 1989 prospectus describes Med–Mobile/Bio–Reference securities as involving a "high degree of risk." [Pl.Exh. 2418 at p. 6]. The company lost $1,915,044 on revenues of $4,171,198 for 1988. [Pl.Exh. 2418 at p. 16]. Med–Mobile/Bio–Reference is an over-the-counter security that, for most or all of the relevant time period, was quoted on NASDAQ. [Pl.Exh. 2602 at p. 192]. In the following time periods, the highest bid price for Med–Mobile/Bio–Reference common stock was:

(1) $3⅞ during 1988;

(2) $2⅞ during 1989;

(3) $3 from January 1, 1989 to July 1, 1990; and

(4) The closing bid price for this stock was $9/32 as of October 2, 1990. [Pl. Exh. 2602 at p. 192; Pl.Exh. 2701 at p. 26].

### J. Ryan-Murphy

Ryan-Murphy was a Stuart-James house stock, which defendants Ben Hasho and Mecca recommended to customers immediately before the filing of this lawsuit in late 1990. [Pl.Exh. 1101 at p. 67]. Ryan-Murphy, located in Denver, Colorado, was incorporated in 1984 and went public in or about March 1987. Ryan-Murphy currently is involved in the testing, excavation, closure, and reinstallation of underground storage tanks and detoxifying contaminated soil. [Pl.Exh. 2501 at p. 12]. A Ryan-Murphy prospectus dated March 1990, states: "These securities involve a high degree of risk.... These securities should only be purchased by persons who can afford a total loss of investment in the company and who have no immediate need for a return on their investment." [Pl.Exh. 2501 at p. 7]. The March 1990 prospectus also disclosed that Ryan-Murphy's predecessor company had made certain misstatements in its initial public offering prospectus and, as a result, Ryan-Murphy "may be subject to recision from or liability to the purchasers in the ... [initial offering]." [Pl.Exh. 2501 at p. 1]. For the year ending January 31, 1990, Ryan-Murphy lost $420,-000 on revenues of $6,675,000. [Pl.Exh. 2502 at p. 6].

### V. Conduct

#### A. Misleading Statements Designed to Induce the Establishment of a Brokerage Account

In order to induce customers either to open brokerage accounts or to transfer their accounts to defendants' brokerage firms, defendants Ben Hasho and Mecca made misleading statements regarding their past performance as registered representatives and made baseless and unjustified predictions that their investment rec-

ommendations would produce future customer profits.

#### 1. *Ben Hasho*

In or about October 1986, during Como's first meeting with Ben Hasho, Ben Hasho told Como that "he had never lost a penny for any of his clients" and that he "values his customer's money as his own." [Pl. Exh. 1207 at p. 9]. Based upon Ben Hasho's representations, Como opened an account at First Jersey and made securities purchases through Ben Hasho. [Pl.Exh. 1207 at p. 9, *et seq.*].

#### 2. *Mecca*

In or about September 1986, Mecca told Cherouvis that Cherouvis would see a 100% to 200% return on his investment if he invested through Mecca at First Jersey. Soon thereafter, Cherouvis opened an account at First Jersey. [Trial at p. 167].

In or about early 1987, Mecca called Costa and told him that Costa's registered representative had left and Mecca would now service his account. [Trial at p. 242]. Costa told Mecca that he wanted to sell his securities or transfer them to the firm where his former registered representative was working. Mecca told Costa that he had a good "track record" for picking stocks, and that by investing through him, Costa could recoup losses he incurred by buying stocks through recommendations of Costa's previous registered representative. [Trial at p 243]. Costa testified that, as a result of this conversation, "Mecca talked me into staying with him and having him as my account representative." [Trial at p. 243].

In or about July 1988, Mecca told Natoli that J.T. Moran had a better "track record" than other brokerage houses and that Natoli would make a lot of money by investing through Mecca. Soon thereafter, Natoli opened an account at J.T. Moran. [Trial at pp. 610–611].

In or about April 1988, Mecca told Alexander that J.T. Moran had a "good track record" for picking stocks and that, during his seven or eight years in the industry, Mecca's personal predictions have always

been correct. Based upon Mecca's representations, Alexander opened an account and made securities purchases through J.T. Moran. [Pl.Exh. 1102 at pp. 9–10, 14].

### B. False Statements Regarding the Possession of Inside Information

On various occasions, defendants Mecca and Yule falsely stated or implied that they possessed material non-public information concerning various issuers in an effort to induce customer stock purchases. In fact, they did not possess such "inside" information. [Trial at p. 785; Pl.Exh. 1101 at p. 151; Pl.Exh. 1201 at p. 90].

#### 1. *Mecca*

In or about September 1986, Mecca told Cherouvis that he had inside information regarding International American Homes, Inc. ("International Home") and that based on this information Cherouvis should purchase shares of International Home. [Trial at pp. 206, 215, 223–230; Pl.Exh. 3001 at ¶¶ 6–11]. In reliance upon Mecca's representations, Cherouvis purchased 1,000 shares of International Home. [Trial at pp. 167–170; Pl.Exh. 3001 at ¶ 19; Pl.Exh. 205 at 9/26/86].

In or about November 1987, Mecca implied to Costa that he had inside information regarding Poseidon Pools of American, Inc. ("Poseidon Pool"). In this regard, Costa testified that, "He implied that he had some inside information on it. He said if I knew what he knew about it, I would put everything I had into it." Mecca recommended that based on this information, Costa should purchase shares of Poseidon Pools. [Trial at p. 246]. In reliance upon Mecca's representations, Costa purchased 4,375 shares of Poseidon Pools for approximately $26,000. [Trial at p. 247; Pl.Exh. 201 at 11/30/87].

In or about December 1987, Mecca implied to Costa that he had inside information regarding Royalpar Industries, Inc. ("Royalpar"). In this regard, Costa testified, "he did imply that he knew something about the company which he couldn't tell me." [Trial at pp. 248–250]. Costa further testified that Mecca told him, "if you knew what I knew about this company, which I can't tell you, you would just put everything into it." [Trial at p. 265]. Mecca recommended that based on this information, Costa should purchase shares of Royalpar. [Trial at pp. 248–250]. Based upon Mecca's representations, Costa sold his shares of Poseidon Pools and used the proceeds to purchase 4,600 shares of Royalpar for approximately $22,000. [Trial at pp. 248–250; Pl.Exh. 201 at 12/31/87].

When Cherouvis first started doing business with Mecca, he asked Mecca about risk factors contained in prospectuses provided to him in connection with Mecca's stock recommendations. During these conversations, Mecca responded that he, "had inside information that these [are] good stocks, I wouldn't make you a bad recommendation." [Trial at p. 208].

#### 2. *Yule*

In or about January 1989, Yule recommended that Hirsch purchase Med–Mobile common stock. [Pl.Exh. 1204 at p. 9]. During this telephone call, Yule told Hirsch in a whisper that he had been "at this meeting" where he had learned information that he could not discuss. Yule further told Hirsch that, based on this information, Yule knew that Med–Mobile "was really going to take off" and that Hirsch should buy as much of it as he could. [Pl.Exh. 1204 at pp. 9–10]. Based upon Yule's representations, Hirsch purchased 3,000 shares of Med–Mobile at $3.75 per share. [Pl.Exh. 1204 at pp. 9–10; Pl.Exh. 303 at 2/28/89].

In the spring of 1989, Yule indicated to Caulfield that he was "connected" with the Istec management and with the principals of J.T. Moran through frequent meetings. Yule further told Caulfield that he had information leading him to believe that Istec was a very good stock to invest in at the time. During this conversation, Yule told Caulfield that if Caulfield knew what Yule knew about Istec, Caulfield would not hesitate to buy the stock. [Trial at pp. 93–94]. Based upon Yule's representations, Caulfield purchased 1,000 shares of Istec at

$3⅛ per share. [Trial at p. 95; Pl.Exh. 30 at 6/30/89].

In or about July 1989, Yule told Garrette that he "knew things" about American Network that he could not discuss on the phone. Yule further told Garrette that what he knew indicated to him that American Network would quickly rise in price to the "double digits." [Pl.Exh. 1205 at p 8]. Based upon Yule's representations, Garrette purchased 1,000 shares of American Network stock at $2¾ per share. [Pl.Exh. 1205 at p. 10; Pl.Exh. 304 at 7/28/89].

In or about July 1989, Yule told Sensibaugh that he was "in meetings with Mr. Moran and different people from the American Network Group and that they were in the process of buying this 100,000 watt radio station and that they were trying to sign a deal with the Southeastern Conference." Yule further told Sensibaugh "the information wasn't on the street yet, but once the information did go out, the stock was going to double or triple." [Pl.Exh. 1203 at p. 14]. Based upon Yule's representations, Sensibaugh purchased 2,000 shares of American Network at $2¾ per share. [Pl.Exh. 1203; Pl.Exh. 302 at 7/28/89].

In or about August 1989, Yule implied to Meyers that he had inside information regarding Med–Mobile stock. [Trial at p 61]. Meyers testified that "there was some conversation that I remember that he had reliable information. I don't know exactly what his source was, and it was not—a specific person, but that there was—there was information that he had some source that was very reliable information that was going to have the stock elevated." [Trial at pp. 61–62]. Meyers further testified that the "inference that I got was that ... [h]e had real inside information on this." [Pl.Exh. 1202 at p. 18]. Based upon Yule's representations, Meyers purchased 1,000 shares of Med–Mobile at $4 per share. [Trial at p. 61; Pl.Exh. 301 at 8/25/89].

In or about early September 1989, Yule recommended that Garrette purchase Med–Mobile stock based on his analysis of the company and "inside information" that he possessed regarding Med–Mobile which in-dicated that the price this stock was "going up." [Pl.Exh. 1205 at p. 16]. Based upon Yule's representations, Garrette purchased 1,000 shares of Med–Mobile at $4 per share. [Pl.Exh. 1205 at p. 19; Pl.Exh. 304 at 9/29/89].

In or about September 1989, Yule told Sensibaugh that he possessed certain information about Med–Mobile that came from "Mr. Moran" about an "AIDS testing procedure." Yule told Sensibaugh that this information had not yet been officially announced. Yule told Sensibaugh that the price of Med–Mobile stock was going to rise as a result of this information. [Pl. Exh. 1203 at p. 19]. Based upon Yule's representations, Sensibaugh purchased 1,000 shares of Med–Mobile at $4 per share. [Pl.Exh. 1203 at p. 20; Pl.Exh. 302 at 9/29/89].

Snedegar testified that Yule said he had "insider information on most or all of his stocks." [Pl.Exh. 1207 at p. 30].

Garrette described a typical conversation with Yule as follows: "You are really going to lose if you don't buy it. And, like I say, get the money anywhere you can to get it because its going to make you money. And he said that he was making a six digit salary and he didn't get paid for making bad recommendations and he knew things about these stocks that he couldn't say on the telephone, and [all] I needed to know was those stocks were going to make money very quickly and that I'd miss the boat if I didn't buy them." [Pl.Exh. 1205 at p. 12].

C. Misrepresentations Regarding Supply of Securities or Minimum Amount of Securities Available for Purchase

In order to induce a customer purchase of securities or to induce a customer to purchase large amounts of securities, defendants Mecca and Vuono misrepresented the minimum number of securities a customer had to buy in order to effectuate a trade. In or about July 1988, Mecca told Natoli that he would not accept an order of Phonetel stock less than $10,000. [Trial at p. 636]. In fact, other customers pur-

chased shares of Phonetel in July 1988 in amounts far less than $10,000. [Pl.Exh. 2801 at ¶ 15.c.]. Natoli eventually purchased less than $10,000 work of Phonetel after he told Mecca that he would not buy such a large amount. [Trial at pp. 636–637].

In or about August or September 1989, Vuono told Beck that Med–Mobile would be sold only in blocks of 1,000 shares. In fact, on September 1, 1989, one of Vuono's other customers purchased 500 shares of Med–Mobile and four customers of other defendants in this action purchased between 500 to 700 shares of Med–Mobile. The next day Vuono called Beck and informed him that he could sell Beck 250 shares of Med–Mobile. Based upon Vuono's representations, Beck purchased 250 shares of Med–Mobile. [Pl.Exh. 1308 at pp. 8–15; Pl.Exh. 2801 at ¶ 15].

### D. Price Predictions and Other Misrepresentations and Omissions of Material Fact

Ben Hasho, Mecca, Yule, and Vuono made baseless price predictions regarding the future performance of various securities, misrepresented or omitted to disclose the speculative nature of securities, and omitted to disclose material information about securities recommended for purchase to customers. In addition, Ben Hasho, Mecca, and Yule guaranteed profits to customers and misrepresented that through defendants stock recommendations customers would recoup past losses.[7]

#### 1. *Ben Hasho*

In or about October 1986, Ben Hasho told Como that Odyssey Entertainment Ltd. ("Odyssey") would rise in price from $1½ per share to $10 per share in the short term. [Pl.Exh. 1004 at pp. 13–14]. Ben Hasho failed to inform Como that Odyssey was a speculative investment. [Pl.Exh. 1004 at pp. 13–14]. Based upon Ben Hasho's representations, Como purchased 6,700 shares of Odyssey on or about October 23, 1986. [Pl.Exh. 1004 at p. 14].

In or about June 1987, Ben Hasho recommended that Como purchase Istec stock. [Pl.Exh. 1004 at p. 25]. Ben Hasho suggested that Como purchase Istec stock to make up for Como's prior losses on Ben Hasho's previous recommendations. [Pl. Exh. 1004 at p. 23]. While Ben Hasho further told Como that he guaranteed a gain on an investment in Istec, he failed to inform Como that Istec was a speculative investment and that Istec had negative earnings. [Pl.Exh. 1004 at p. 26, 27]. Based upon Ben Hasho's representations, Como purchased 600 shares of Istec at $3½ per share in or about June 1987. [Pl.Exh. 1004 at p. 27].

In or about May 1989, Ben Hasho recommended that Poff purchase Healthcare stock. [Pl.Exh. 1003 at p. 8]. At that time, Ben Hasho told Poff that Healthcare was an "excellent company" and that every company that had been in the same business had merged or been acquired by another company. He also told Poff that such activity would make Healthcare stock "at least double in the next couple months," and that the stock price would go to "$10 to $15." [Pl.Exh. 1003 at pp. 8–9]. Not only did Ben Hasho fail to explain the risks associated with a purchase of Healthcare common stock, but he also told Poff that Healthcare's "financial position was excellent." [Pl.Exh. 1003 at p. 9, 15]. Based upon Ben Hasho's representations, Poff purchased 2,000 shares of Healthcare at $2¼ per share on or about May 31, 1989. [Pl.Exh. 1003 at p. 10]. From the beginning of 1989 through July 1, 1990, the bid price for Healthcare common stock never went above $2⅝ per share. [Pl.Exh. 2602 at p. 795]. Ben Hasho's commission on the trade was approximately 20% of the purchase price. [Pl.Exh. 602.] In or about mid 1989, Ben Hasho recommended that Como purchase Phonetel warrants. [Pl. Exh. 1004 at pp. 29–30]. Ben Hasho failed to disclose that Phonetel had negative earnings, and that Phonetel warrants are a speculative investment. [Pl.Exh. 1004 at p. 30]. Ben Hasho told Como that Phonetel was about to enter into a new contract, and

---

**7.** The following findings are arranged roughly in chronological order.

that the price of the warrants would rise from $7 per warrant to $10 or $12 in 30 days. Como testified that: "He guaranteed it to me because ... if he doesn't come through on this, I could come down to the office and 'kick him in the ass.'" [Pl.Exh. 1004 at p. 30]. Based upon Ben Hasho's representations, Como purchased 500 Phonetel warrants at $7 each on or about August 29, 1989. [Pl.Exh. 1004 at p. 31; Pl. Exh. 107 at 9/29/89]. Ben Hasho's commission on the trade was approximately 5% of the purchase price. [Pl.Exh. 107 at 9/29/89].

On various occasions during June and July 1989, Ben Hasho recommended that Poff purchase Advanced Products stock. Ben Hasho told Poff that Advanced Products' voice translation product would come onto the market in August and that as a result he expected Advanced Products stock price to "go through the roof." Poff further testified that Ben Hasho "told me that no other company in the world had this technology, which I found out shortly afterwards Japan had it for several years." [Pl.Exh. 1003 at p. 12]. Ben Hasho also guaranteed that the price of Advanced Products stock would rise to $20 to $25 a share in six months. [Pl.Exh. 1003 at p. 13]. Ben Hasho failed to explain the risks associated with a purchase of Advanced Products stock. [Pl.Exh. 1003 at p. 15]. Based upon Ben Hasho's representations, Poff purchased 10,000 shares of Advanced Products at $2¼ per share on or about July 24, 1989. [Pl.Exh. 1003 at p. 24; Pl.Exh. 103 at 7/28/89]. From the beginning of 1989 through July 1, 1990, the bid price for Advanced Products common stock never went about $2½ per share. [Pl.Exh. 2603 at p. 24]. Ben Hasho's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 103 at 7/28/89].

In or about late July 1989, Ben Hasho recommended that Leatherbury purchase Advance Products stock. [Pl.Exh. 1002 at p. 9]. Ben Hasho told Leatherbury that the company had a "hot product," that its stock would "take off," and would probably increase 25% to 50% within six months. [Pl.Exh. 1002 at p. 9, 10]. Ben Hasho also told Leatherbury that the stock did not have a lot of "downside risk." [Pl.Exh. 1002 at p. 11]. Based upon Ben Hasho's representations, Leatherbury purchased 1,000 shares of Advanced Products at $2¾ per share on or about August 3, 1989. [Pl.Exh. 1002 at pp. 11–12; Pl.Exh. 102 at 8/25/89]. From the beginning of 1989 through July 1, 1990, the bid price for Advanced Products common stock never went above $2½ per share. [Pl.Exh. 2603 at p. 24]. Ben Hasho's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 102 at 8/25/89].

In or about July and August 1989, Ben Hasho, on a number of occasions, recommended that Tate purchase Med–Mobile stock. [Trial at p. 652]. On three or four occasions, Ben Hasho told Tate that Med–Mobile would double within a period of six months. [Trial at p. 654]. Ben Hasho failed to inform Tate that Med–Mobile was a speculative investment and that the company was experiencing losses. [Trial at p. 653, 655].

In conversations about Med–Mobile, Ben Hasho also told Tate that his investment in Med–Mobile would be insured against loss by an insurance company. [Trial at p. 654]. Specifically, Ben Hasho told Tate "if you buy this stock, that its a solid growing stock and that its even got an insurance brokerage company behind it." [Trial at p. 666]. Based upon Ben Hasho's representations, Tate purchased 500 shares of Med–Mobile at $4 per share on or about September 8, 1989. [Pl.Exh. 101 at 9/29/89]. From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never went above $3 per share. [Pl. Exh. 2602 at p. 20]. Ben Hasho's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 101 at 9/29/89].

On a number of occasions, in or about August 1989, Ben Hasho, recommended that Poff purchase American Network stock. [Pl.Exh. 1003 at p. 17]. Ben Hasho told Poff that American Network "would at least double" and that this would happen "probably within the next six months." [Pl.Exh. 1003 at p. 18]. Based on Ben Hasho's representations, Poff purchased

**1082**

5,000 shares of American Network at $2⅝ per share on or about August 1, 1989. [Pl.Exh. 1003 at p. 18; Pl.Exh. 103 at 7/28/89]. From the beginning of 1989 through July 1, 1990, the bid price for American Network common stock never went above $2½ per share. [Pl.Exh. 2602 at p. 74]. Ben Hasho's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 602].

Poff further testified that Ben Hasho "called me back that same day and said the stock was really moving fast and he said this was the time to get in on this stock some more and then he was talking about again having my portfolio in six figures, six-digit figures." [Pl.Exh. 1003 at p. 18]. At the time Ben Hasho spoke about having Poff's portfolio in the six-digit figures, Poff had invested approximately $30,000 through Ben Hasho. [Pl.Exh. 1003 at p. 18]. Ben Hasho further told Poff that a failure to buy immediately would adversely affect his ability to make money. [Pl.Exh. 1003 at pp. 18–19]. He also guaranteed that Poff would make money on an investment in American Network. [Pl.Exh. 1003 at p. 19]. Based upon Ben Hasho's representations, Poff purchased an additional 5,000 shares of American Network at $2¾ per share on or about August 1 1989. [Pl. Exh. 1003 at p. 19; Pl.Exh. 103 at 7/28/89]. Ben Hasho's commission on the trade was approximately 11% of the purchase price. [Pl.Exh. 103 at 7/28/89].

In or about August 1989, Ben Hasho recommended that Poff purchase shares of Med–Mobile stock. [Pl.Exh. 1003 at p. 20]. Poff testified that "[h]e was speaking of the AIDS epidemic and how much work was going into it with the laboratories and so on. And this particular company, working so close with it, moving the blood and so on from one place to another, from one laboratory to another, he said it would go through the roof. And he said it was absolutely a sure thing. It can't miss." [Pl. Exh. 1003 at p. 20]. Ben Hasho further told Poff that Med–Mobile "would just continue to rise. Maybe as high as $20 or $30 per share." [Pl.Exh. 1003 at p. 20]. Based upon Ben Hasho's representations, Poff purchased 1,000 shares of Med–Mobile at

$4 per share on or about August 28, 1989. [Pl.Exh. 1003 at p. 21; Pl.Exh. 103 at 9/29/89]. From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never went above $3 per share. [Pl.Exh. 2602 at p. 220]. Ben Hasho's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 103 at 9/29/89].

In or about August 1989, Ben Hasho recommended that Leatherbury purchase shares of Med–Mobile stock. [Pl.Exh. 1002 at p. 14]. Leatherbury testified that "this one he [Ben Hasho] was very excited about and felt that it was going to be a real winner. That it could go up at least 50 percent in value over the next month period." [Pl.Exh. 1002 at p. 15]. Ben Hasho failed to explain to Leatherbury the risks associated with a purchase of Med–Mobile stock. [Pl.Exh. 1002 at pp. 14–15]. Based upon Ben Hasho's representations, Leatherbury purchased 1,000 shares of Med–Mobile at $4 per share on or about September 4, 1989. [Pl.Exh. 1002 at p. 15; Pl.Exh. 102 at 9/29/89]. From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never went about $3 per share. [Pl.Exh. 2602 at p. 220]. Ben Hasho's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 102 at 9/29/89].

In or about late 1989, Ben Hasho recommended that Tlusty purchase shares of Istec stock. [Pl.Exh. 1005 at p. 7]. At that time, he told Tlusty that Istec would double and triple in a short period of time. [Pl. Exh. 1005 at p. 7]. When asked how long Ben Hasho projected that this price rise would take to occur, Tlusty testified that "in our conversations, we were talking in terms of less than six months." [Pl.Exh. 1005 at p. 7]. Based upon Ben Hasho's representations, Tlusty purchased 500 shares of Istec at $4½ per share on or about September 28, 1989. [Pl.Exh. 1005 at p. 10; Pl.Exh. 105 at 10/27/89]. From the beginning of 1989 through July 1, 1990, the bid price for Istec common stock never went above $4⅛ per share. [Pl.Exh. 2602 at p. 903]. Ben Hasho's commission on the

trade was approximately 15% of the purchase price. [Pl.Exh. 105 at 10/27/89].

In or about October 1989, Ben Hasho recommended that Tate purchase shares of Advanced Products stock. [Trial at p. 656]. He told Tate that Advanced Products "would make a great gain with a year's time because it was a hot piece of merchandise that had just hit the market and it was starting to sell like wild fire." [Trial at pp. 656–657]. He also said that the price of the stock would probably go up to $7 within six months time. [Trial at pp. 656–657]. Ben Hasho never told Tate that Advanced Products was a speculative security. [Trial at p. 657]. Tate declined to purchase Advanced Products stock because he was not satisfied with the performance of Med–Mobile, which he had purchased previously through Ben Hasho. [Trial at pp. 657–658].

In or about October 1989, Ben Hasho recommended that Cardillo purchase Healthcare stock. [Trial at p. 126; Pl.Exh. 104 at 10/27/89]. Ben Hasho told Cardillo that Healthcare "was going to go up two or three times" in a short period of time, meaning "three or four months down the road." [Trial at pp. 126–127]. Based upon Ben Hasho's representations, Cardillo purchased 1,100 shares of Healthcare at $2⅞ per share on or about October 12, 1989. [Trial at p. 126; Pl.Exh. 104 at 10/27/89]. From the beginning of 1989 through July 1, 1990, the bid price for Healthcare common stock never went above $2⅝ per share. [Pl.Exh. 2602 at p. 795]. Ben Hasho's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 2602 at p. 795; Pl.Exh. 104 at 10/27/89].

In or about late October 1989, Ben Hasho recommended that Tlusty purchase International Bankcard stock. [Pl.Exh. 1005 at p. 15]. Ben Hasho told Tlusty that International Bankcard would double or triple in less than six months time. [Pl.Exh. 1005 at pp. 17–18]. Based upon Ben Hasho's representations, Tlusty purchased 2,200 shares of International Bankcard at $1¹⁵⁄₁₆ per share on or about October 31, 1989. [Pl. Exh. 1005 at p. 18; Pl.Exh. 105 at 11/24/89]. From the beginning of 1989 through July 1, 1990, the bide price for International Bankcard common stock never went above $1⅛ per share. [Pl.Exh. 2601 at p. 923]. Ben Hasho's commission on the trade was approximately 14% of the purchase price. [Pl.Exh. 105 at 11/24/89].

In or about early November 1989, Ben Hasho recommended that Leatherbury purchase shares of International Bankcard stock. [Pl.Exh. 1002 at p. 17]. Ben Hasho told Leatherbury that the risks associated with investing in International Bankcard were very low and that International Bankcard "would be a big mover in the next six months." [Pl.Exh. 1002 at p. 17, 18]. Based upon Ben Hasho's representations, Leatherbury purchased 1,000 shares of International Bankcard stock at $1¹⁵⁄₁₆ per share on or about November 17, 1989. [Pl. Exh. 1002 at p. 19; Pl.Exh. 102 at 11/24/89]. Ben Hasho's commission on the trade was approximately 14% of the purchase price. [Pl.Exh. 102 at 11/24/89].

In or about late November or early December 1989, Ben Hasho recommended that Cardillo purchase EMS stock. [Trial at p. 129; Pl.Exh. 104 at 12/31/89]. Ben Hasho told Cardillo that he could "double and triple" Cardillo's funds with an investment in EMS. [Trial at p. 129]. Based upon Ben Hasho's representations, Cardillo purchased 1,000 shares of EMS at $2⅛ per share on or about December 5, 1989. [Trial at p. 130; Pl.Exh. 104 at 12/31/89]. From the beginning of 1989 through July 1, 1990, the bid price of EMS common stock never went above $2 per share. [Pl.Exh. 2601 at p. 545; Pl.Exh. 2602 at p. 503]. Ben Hasho's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 102 at 12/31/89].

On or about December 21, 1989, Poff discussed with Ben Hasho unauthorized purchases of Med–Mobile stock that appeared in his J.T. Moran account. [Pl.Exh. 1003 at p. 31]. Poff testified that when he asked Ben Hasho about these unauthorized trades, Ben Hasho replied that Med–Mobile "was still going through the roof and was going to explode in price anytime." At this time, Ben Hasho predicted that Med–Mobile would trade at approximately $20 to $30 per share. [Pl.Exh. 1003 at p. 31].

From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never went above $3 per share. [Pl. Exh. 2602 at p. 220].

In or about July 1990, Ben Hasho recommended that Piteo purchase shares of Greenstone Rabasca Roberts, Inc. ("Greenstone"). [Trial at p. 141]. He promised Piteo that the price of the stock would rise 30% to 40%. At the time of this statement, the Greenstone price per share was $1.21. [Trial at p. 141]. Ben never said any negative things about the stock, and never informed Piteo that Greenstone was a speculative investment. [Trial at p 141]. Based upon Ben Hasho's representations, Piteo purchased 2,500 shares of Greenstone at $1.21 per share. [Trial at pp. 141–142].

In or about August 1990, Ben Hasho recommended that Piteo purchase Ryan–Murphy stock. [Trial at p. 144]. Piteo testified that Ben Hasho "called me up, like the police was behind it. He said, I have one more thousand shares, you have got to buy it. Everyone in the office, all the brokers, want this stock." [Trial at p. 144]. Ben Hasho told Piteo that the price of Ryan–Murphy stock would increase to between $4 and $7 per share. [Trial at p. 145]. Based upon Ben Hasho's representations, Piteo sold his Greenstone stock and with the proceeds purchased 1,700 shares of Ryan–Murphy at $1.81 per share. [Trial at pp. 144–145].

## 2. *Mecca*

In or about September 1986, Mecca recommended that Cherouvis purchase International Home stock. Mecca told Cherouvis that International Home was a "guaranteed stock that ... couldn't lose," and that the price of the stock would appreciate 50% to 60% within 90 days. [Trial at p. 168]. Mecca suggested that Cherouvis borrow money to make a purchase of International Home. [Trial at p. 168, 169]. In addition, Mecca told Cherouvis that he had 50,000 to 100,000 shares available for purchase, that these shares were available only for "special investors," and that all the shares would be sold if he did not buy quickly. [Trial at p. 170; Pl.Exh. 3001 at

¶ 14, 16]. Mecca also told Cherouvis that International Home was trading at "below book value." [Trial at pp. 168–170; Pl. Exh. 3001 at ¶¶ 6–8]. When Cherouvis requested a prospectus before he purchased, Mecca said that he would send one later. [Pl.Exh. 3001 at ¶¶ 13–14]. Based upon Mecca's representations, Cherouvis purchased 1,000 shares of International Home at $4.25 per share. [Trial at p. 170; Pl. Exh. 3001 at ¶ 19; Pl.Exh. 205 at 9/26/86]. Cherouvis paid for this purchase with money he borrowed from his mother. [Trial at p. 170]. Cherouvis received an International Home prospectus after this purchase. [Trial at p. 205].

In late 1986, Mecca recommended that Cherouvis purchase shares of Odyssey. Mecca told Cherouvis that in 60 to 80 days he would recoup his investment. [Trial at p. 172]. In addition, Mecca told Cherouvis that the stock was "hot," that it was "trading below book value," and that it was a "guaranteed investment." [Trial at pp. 171–172]. Based upon Mecca's representations, Cherouvis purchased 2,000 shares of Odyssey in or about late 1986. [Pl.Exh. 3001 at ¶¶ 20–23]. Cherouvis' account statements indicate that this purchase was made in three separate transactions. [Pl. Exh. 205 at 9/26/86, 10/31/86].

In or about late October and early November 1986, Mecca recommended that Cherouvis purchase securities of Metalbanc Corp. ("Metalbanc"). Mecca "guaranteed" Cherouvis that an investment in Metalbanc would provide a 100% to 200% return. [Trial at p. 173; Pl.Exh. 3001 at ¶ 36]. Mecca told Cherouvis that Metalbanc was such a good buy that an executive in his office was purchasing the stock. [Trial at p. 173; Pl.Exh. 3001 at ¶ 26]. Mecca also told Cherouvis that he had good sources of information about Metalbanc and that a purchase of Metalbanc would be "good Christmas bonus" for Cherouvis. [Pl.Exh. 3001 at ¶¶ 28, 31]. Based upon Mecca's representations, Cherouvis purchased 1,000 shares of Metalbanc at $2.50 per share. [Trial at pp. 175–176; Pl.Exh. 3001 at ¶ 27; Pl.Exh. 205 at 10/31/88].

In or about mid–1987, Mecca recommended that Cherouvis purchase Sherwood securities. Mecca guaranteed Cherouvis that he could double his money with such an investment. [Trial at p. 176]. Mecca further told Cherouvis "trust me, this [is] guaranteed to go up." [Pl.Exh. 3001 at ¶ 48]. Mecca did not disclose to Cherouvis that Sherwood was a speculative investment. [Trial at p. 177]. Based upon Mecca's representations, Cherouvis purchased 2,000 shares of Sherwood stock at $8.50 per share. [Trial at p. 177; Pl.Exh. 3001 at ¶ 49; Pl.Exh. 205 at 6/30/87]. Cherouvis borrowed the funds to make this purchase. [Trial at p. 177].

In or about late 1987, Mecca recommended that Costa purchase Benihana National Corp. ("Benihana") stock. [Trial at p. 244]. Mecca told Costa that Benihana was a "can't lose" situation, and that he should borrow money if necessary to finance a purchase of Benihana. [Trial at pp. 244–245]. Based upon Mecca's representations, Costa purchased 4,000 shares of Benihana for a total cost of approximately $17,000. [Trial at 245; Pl.Exh. 201 at 10/30/87]. Mecca's commission on the trade was approximately 6% of the purchase price. [Pl.Exh. 701].

In or about November 1987, Mecca called Costa and recommended that Costa purchase Poseidon Pools stock. [Trial at p. 246]. Mecca told Costa that he could double his money within six months by investing in Poseidon Pools. [Trial at p. 246]. Mecca recommended that Costa invest $100,000 in the stock and that he "sink everything" he had into it. Mecca told Costa that he "couldn't lose" with an investment in Poseidon Pools, and suggested that Costa borrow money to finance a purchase of the stock. [Trial at p. 247]. Based upon Mecca's representations, Costa purchased 4,375 shares of Poseidon Pools stock for a total of $26,000. [Trial at p. 247; Pl.Exh. 201 at 11/30/87]. Costa paid for this purchase with money inherited from his father. [Trial at p. 247]. Mecca's commission on the trade was approximately 9% of the purchase price. [Pl.Exh. 201 at 11/30/87; Pl.Exh. 701].

In or about mid-December 1987, Mecca suggested that Costa sell his Poseidon Pools stock and use the proceeds to purchase Royalpar stock because Poseidon Pools "wasn't a good holding anymore." [Trial at p. 248]. Mecca told Costa that Costa was a "preferred customer" and that he was doing Costa a "favor" by providing him with this information. [Trial at p. 248]. Once again, Mecca recommended that Costa borrow funds to finance the purchase. [Trial at p. 249]. Based upon Mecca's representations, Costa sold his Poseidon Pools stock and used the proceeds to purchase 4,600 shares of Royalpar at $4.81 per share. [Trial at p. 249; Pl.Exh. 201 at 12/31/87]. Mecca's commission on the trade was approximately 9% of the purchase price. [Pl.Exh. 201 at 12/31/87; Pl. Exh. 701].

In or about March 1988, Mecca recommended that Costa purchase Academy Insurance Group, Inc. ("Academy Insurance") stock. [Trial at p. 250]. Mecca told Costa that by purchasing Academy Insurance shares, he could recoup his losses from previous investments made on Mecca's recommendation. Mecca also told Costa that he could not lose by purchasing Academy Insurance. [Trial at p. 250]. Based upon Mecca's representations, Costa sold his Royalpar shares and with the proceeds purchased 7,700 shares of Academy Insurance at $2.75 per share. [Trial at p. 251; Pl.Exh. 201 at 3/31/88].

In or about June 1988, Mecca recommended that Cherouvis purchase J.T. Moran Financial stock. [Trial at p. 178; Pl. Exh. 3001 at ¶ 50]. Mecca told Cherouvis that he "couldn't lose" on an investment in J.T. Moran Financial stock, that it was a "guaranteed" stock, that the stock was "hot," and that the stock would double in price in 30 days. [Trial at p. 179; Pl.Exh. 3001 at ¶ 53]. In addition, Mecca told Cherouvis that J.T. Moran Financial "is not going to go out of business." [Trial at p. 181]. He never warned Cherouvis that he could lose his entire investment with funds invested in J.T. Moran Financial stock. [Trial at p. 181]. Nor did he inform Cherouvis that J.T. Moran Financial had lost $4.8 million for the year ending March

1988. [Pl.Exh. 1801 at p. 23]. Cherouvis would have considered such information material to his investment decision. [Trial at pp. 181–183]. Based upon Mecca's representations, Cherouvis purchased 2,100 J.T. Moran Financial shares at $5.62 per share. [Trial at p. 182; Pl.Exh. 3001 at ¶ 54; Pl.Exh. 205 at 6/30/88]. In 1988, the bid price for J.T. Moran never exceeded $6 per share. [Pl.Exh. 2601 at p. 1156].

In or about July 1988, Mecca recommended that Natoli purchase Phonetel stock. He told Natoli that the price of Phonetel would double or triple within three months, and that he wanted Natoli to buy $10,000 worth of the stock. [Trial at p. 611]. Mecca also told Natoli that this recommendation was going to be the "foundation of a long term relationship," that Natoli "Was going to make a lot of money on this stock," and that "the turn-around would be quick." [Trial at p. 613]. Based upon Mecca's representations, Natoli purchased 1,000 shares of Phonetel at $3.12 per share. [Trial at p. 613; Pl.Exh. 203 at 8/31/88]. In 1988, the bid price for Phonetel common stock never went above $3 per share. [Pl.Exh. 2602 at p. 1293]. Mecca's commission on the trade was approximately 10% of the purchase price. [Pl.Exh. 203 at 8/31/88].

In or about October 1988, Mecca recommended that Costa purchase J.T. Moran Financial units. Mecca told Costa that he would double his money in six months by investing in J.T. Moran Financial units. [Trial at p. 252]. In addition, Mecca told Costa that J.T. Moran principals were buying the securities and that this would cause the price to rise. [Trial at p. 252]. Based on Mecca's representations, Costa purchased six J.T. Moran financial units in or about October 1988 at approximately $1,000 each. [Trial at p. 252; Pl.Exh. 201 at 10/31/88]. In 1989, the bid price for J.T. Moran Financial units never went above $925 each. [Pl.Exh. 2601 at pp. 1155–1156].

In or about October 1988, Mecca recommended that Natoli purchase J.T. Moran Financial units. Mecca did not disclose to Natoli that J.T. Moran Financial lost $4.8

million for the year ending March 31, 1988. Natoli would have found such information material. [Trial at pp. 616–17]; Pl.Exh. 1801 at p. 23]. Based upon Mecca's representations, Natoli purchased three J.T. Moran Financial units at $1,000 per unit. [Trial at pp. 614–617; Pl.Exh. 203 at 10/31/88].

In or about April 1989, Mecca recommended that Alexander purchase American Network stock. He told Alexander that Ted Turner would buy out American Network within six months and that as a result the price of American Network would double in that time period. [Pl.Exh. 1102 at pp. 12–13]. Mecca recommended that Alexander purchase 10,000 shares of American Network. When Alexander told Mecca that he could not afford to purchase this many shares, Mecca suggested that Alexander take the money out of his business and borrow the money. [Pl.Exh. at pp. 14–15]. Based upon Mecca's representations, Alexander purchased 1,000 shares of American Network at $2.25 per share. [Pl.Exh. 1102 at p. 15; Pl.Exh. 204 at 4/28/89]. In 1989, the bid price for American Network common stock never went above $2½ per share. [Pl. exh. 2602 at p. 74]. Mecca's commission on the trade was approximately 7% of the purchase price. [Pl.Exh. 204 at 8/31/88].

In or about May 1989, Mecca recommended that Lambiase purchase $10,000 worth of Istec stock. [Trial at p. 565]. Although Lambiase asked to see an Istec prospectus before he purchased, Mecca responded that he would send one, but that Liambiase "would have to invest right now ... in order to get a very good price." [Trial at p. 565]. Lambiase also told Mecca that he needed to keep his capital liquid. In response, Mecca told Lambiase that the price of Istec stock would double and that Lambiase could get his money back in three months. [Trial at pp. 565–566]. Mecca did not disclose to Lambiase that Istec had lost $4.1 million for the year ended 1988. [Trial at p. 567; Pl.Exh. 2105 at p. 6]. Lambiase testified that he agreed to purchase approximately $3,000 worth of Istec stock because, among other things,

Mecca "seemed like he knew what he was talking about." [Trial at p. 566].

Following this purchase authorization, Lambiase decided that he did not want the stock and did not send a check for payment. [Trial at p. 567]. Mecca called Lambiase for approximately two weeks and Lambiase did not return Mecca's telephone calls. When Mecca finally reached Lambiase, Lambiase told Mecca that he "just didn't want to invest that money at that time." [Trial at p. 567]. Lambiase testified at trial that Mecca then, "started yelling and screaming and cursing at me" and told him that he had to purchase the stock. Lambiase then agreed to pay for the stock because he "felt a little guilty by then, and, you know, I felt bad for him." Mecca also told Lambiase, during this conversation, that the price of Istec was going to double in three months. [Trial at pp. 567–568]. The following day, Mecca drove to Lambiase's home in a "red Porsche" and picked up payment for the Istec shares. [Trial at pp. 568–560]. When Mecca picked up the check, he again told Lambiase that the price of Istec would double in three months. [Trial at p. 569]. Lambiase, without receiving an Istec prospectus prior to his purchase, purchased 1,000 shares of Istec at $3.50 per share on or about June 5, 1989. [Trial at pp. 589–90]; Pl.Exh. 202 at 6/30/89]. In 1989, the bid price for Istec common stock never went above $4⅛ per share. [Pl.Exh. 2602 at p. 903]. Mecca's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 202 at 6/30/89].

In or about June 1989, Mecca recommended that Alexander purchase Phonetel stock. Mecca told Alexander that the price of Phonetel stock, then trading at $3.75 per share, should rise to $5 per share in ten months. [Pl.Exh. 1102 at p. 18]. When Alexander asked Mecca for further details, Mecca responded, "Well, you don't know the market. I know the market. You let me worry about that. You work about your business and let me worry about what goes on in the market." Mecca failed to disclose to Alexander that Phonetel had historically experienced negative earnings. [Pl.Exh. 1102 t p. 19–20]. When Alexander

responded that he did not have the funds to make such a purchase, Mecca told Alexander to "go to the stash or borrow" the funds to make the investment. [Pl.Exh. 1102 at p. 20]. Based upon Mecca's representations, in or about June 1989, Alexander purchased 1,000 shares of Phonetel at $3.75 per share. [Pl.Exh. 1102 at p. 20; Pl.Exh. 204 at 6/30/89]. Mecca's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 703].

In or about August 1989, Mecca recommended that Alexander purchase American Network stock. With regard to American Network, Mecca told Alexander "you better jump in now and get all you can" and recommended that Alexander purchase 10,000 shares. [Pl.Exh. 1102 at p. 24]. When Alexander responded that he could not afford to purchase this many shares, Mecca suggested that Alexander borrow the funds from the bank or "on the home" to make the purchase. Mecca told Alexander, "You can't miss a chance like this." [Pl. Exh. 1102 at p. 24]. Based upon Mecca's representations, in or about August 1989, Alexander purchased 1,000 shares of American Network at $2.75 per share. [Pl.Exh. 1102 at p. 24; Pl.Exh. 204 at 8/25/89]. In 1989, the bid price for American Network common stock never went above $2½ per share. [Pl.Exh. 2602 at p. 74]. Mecca's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 204 at 8/25/89; Pl.Exh. 703].

In or about late October 1989, Lambiase decided to sell securities holdings that he had purchased through Mecca. When Lambiase called Mecca to tell him this, Mecca recommended that Lambiase purchase Phonetel stock. [Trial at p. 571]. Lambiase testified, "He actually tried to talk to me into buying more stocks in a company called Phonetel. When I was trying to get my money back out, he was trying to get me to put more money back in. [Trial at p. 271]. Mecca told Lambiase that Phonetel was a "hot" stock and that it "was definitely going to go through the roof." Mecca also told Lambiase that through an investment in Phonetel, Lambiase could "make up" for losses he sus-

tained on prior investments. [Trial at p. 572]. Mecca then told Lambiase, "I can't get you out of Istec, unless you get into Phonetel." [Trial at p. 572]. Mecca did not disclose to Lambiase that Phonetel had lost $783,000 for the year ending 1988 and $199,000 for the quarter ending March 1989. [Pl.Exh. 1605 at p. 15; Pl.Exh. 1606 at p. 4]. Mecca also failed to disclose to Lambiase that Phonetel was a speculative high risk investment. [Trial at pp. 573–574]. Lambiase sold Istec and with the proceeds purchased 600 shares of Phonetel at $4.50 per share. [Trial at pp. 572–573; Pl.Exh. 202 at 11/24/89]. Lambiase testified that he made this purchase because "I wanted to get out of Istec and I just wanted to get my money back ... and the only way I could get out of Istec was to buy Phonetel." [Trial at p. 599]. Mecca's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 202 at 11/24/89].

In or about July or August 1990, Mecca recommended that Bryla purchase Ryan–Murphy shares. Mecca told Bryla that Ryan–Murphy had the potential to triple in value in the short term. [Pl.Exh. 1103 at pp. 23–24]. Mecca never disclosed to Bryla the risk of an investment in Ryan–Murphy. [Pl.Exh. 1103 at p. 27]. Based upon Mecca's recommendation, Bryla purchased 3,000 shares of Ryan–Murphy, at $2 per share, on or about August 8, 1990. [Pl. Exh. 1103 at pp. 23, 28].

In or about mid-August 1990, in a series of telephone conversations, Mecca recommended that Bryla purchase shares of ECI Telecom Ltd. ("ECI Telecom"). Mecca told Bryla that he had "just come out of a meeting" where he had learned news that the price of ECI Telecom was "going to be on a run up." [Pl.Exh. 1103 at pp. 32–33]. Mecca told him that ECI Telecom stock,

then trading at $24 per share, would in "the short run ... move from 35 to $40 a share." [Pl.Exh. 1103 at pp. 33–35]. Based on Mecca's representations, Bryla purchased 150 shares of ECI Telecom on August 14, 1990 at $24⅛ per share. [Pl. Exh. 1103 at p. 35]. On or about August 15, 1990, Mecca called Bryla and told him that "The stock is doing just what we thought it would. It is making its run up. If you've got some more cash ... find it, sock it in here." Based upon Mecca's representations, Bryla purchased 100 additional shares of ECI Telecom at $25¾ per share on or about August 15, 1990. [Pl. Exh. 1103 at pp. 36–37].

In or about September 1990, Mecca again recommended that Bryla purchase Ryan–Murphy stock. When Bryla told Mecca that he did not have any money to invest, Mecca responded "let's get the money out of [ECI Telecom] and let's re-invest it in Ryan–Murphy." Mecca stated that he expected the price of Ryan–Murphy to rise by four to five times. Based upon Mecca's representations, Bryla sold his ECI Telecom holdings and, with the proceeds, purchased 2,200 shares of Ryan–Murphy at $2.50 per share. [Pl.Exh. 1103 at pp. 38–40].[8]

### 3. *Yule*

In or about January 1989, Yule recommended that Hirsch purchase Med–Mobile stock. [Pl.Exh. 1204 at p. 9]. Yule told Hirsch that he had a limited supply of Med–Mobile stock and, having just come from a research meeting, that he expected the price of Med–Mobile stock to double within 60 to 90 days. [Pl.Exh. 1204 at p. 9]. Based upon Yule's representations, Hirsch borrowed funds to purchase 1,500 shares of Med–Mobile at $3¾ per share on

---

**8.** In addition to these specific instances, some of Mecca's customers testified that Mecca consistently made certain statements about a stocks performance. For example, each time Mecca recommended a security to Natoli, Mecca told Natoli that the security was going to substantially outperform the market. [Trial at p. 615]. Mecca always guaranteed price increased on securities recommendations to Cherouvis. [Trial at pp. 173–226]. Mecca told Costa that various investments were "can't lose situations." [Trial at p. 272].

Indeed, Mecca admitted at trial that when recommending securities for customer purchase, he did not disclose to customers all risk factors contained in prospectuses for those securities. [Trial at pp. 821–831]. Mecca testified at deposition that he did not always send customers prospectuses prior to customer purchases of securities. [Pl.Exh. 1101 at pp. 91–93]

or about February 2, 1989. [Pl.Exh. 1204 at p. 10; Pl.Exh. 303 at 2/28/89]. From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never went above $3 per share. [Pl.Exh. 2602 at p. 220]. Yule's commission on the trade was approximately 9% of the purchase price. [Pl.Exh. 303 at 2/28/89].

In or about May or June 1989, Yule recommended that Caulfield purchase shares of Istec stock. [Trial at p. 93]. Yule told Caulfield there was "virtually no risk" in an Istec investment, that a profit was guaranteed, that Caulfield would hit a "home run" with an investment in Istec and that the price of Istec would be in the "double digits" within six months. [Trial at pp. 94–95]. Based upon Yule's representations, Caulfield purchased 1,000 shares of Istec stock at $3⅛ per share on or about June 8, 1989. [Trial at p. 95; Pl.Exh. 305 at 6/30/89]. From the beginning of 1989 through July 1, 1990, the bid price for Istec common stock never went above $4⅛ per share. [Pl.Exh. 2602 at p. 903]. Yule's commission on the trade was approximately 12% of the purchase price. [Pl.Exh. 305 at 6/30/89].

Yule testified at trial that he told Caulfield: "based on the fact that the company [Istec] had spun this offering off and that they were coming closer to breaking even through successfully spinning off these companies, that I thought the company would trade a lot higher than the $3½ or $4 that he purchased it at." [Trial at p. 918].

In or about July 1989, Yule recommended that Caulfield sell his Istec holdings and use the proceeds to purchase Healthcare stock. [Trial at p. 100]. Yule told Caulfield that Healthcare stock "was probably going to go up 400%" and that if Caulfield bought soon he could "hit a home run" with this stock. [Trial at p. 101]. Based upon Yule's representations, Caulfield directed Yule to purchase 600 shares of Healthcare common stock for his account at approximately $2 per share. [Trial at p. 101]. Yule failed to make this purchase. [Trial at p. 102]. From the beginning of 1989 through July 1, 1990, the bid price for Healthcare common stock nev-

er went above $2⅝ per share. [Pl.Exh. 2602 at p. 795].

In or about July 1989, Yule recommended that Sensibaugh purchase American Network stock. [Pl.Exh. 1203 at p. 10]. Yule told Sensibaugh that this stock "was going to go through the roof" and that "it would double at a minimum and it could go a lot higher than that." [Pl.Exh. 1203 at p. 10]. Yule further told Sensibaugh that American Network stock would double in "30 to 60 days" and that "[i]t would be a sure thing and would be doubling at least." [Pl.Exh. 1203 at p. 11]. Yule also told Sensibaugh that American Network was such a "sure thing" and that the price was going to rise so quickly, that he was recommending that all of his clients purchase at least 10,000 shares. [Pl.Exh. 1203 at p. 15]. Based upon Yule's representations, Sensibaugh purchased 2,000 shares of American Network at $2¾ per share on or about August 2, 1989. [Pl.Exh. 1203 at p. 14; Pl.Exh. 302 at 7/28/89]. From the beginning of 1989 through July 1990, the bid price for American Network common stock never exceeded $2½ per share. [Pl.Exh. 2602 at p. 74]. Yule's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 302 at 7/28/89].

In or about late July 1989, Yule recommended that Garrette purchase American Network stock. [Pl.Exh. 1205 at p. 7]. Garrette testified that "[t]he price at that time was $2¼. And he told me that within a quarter that stock would go to double digits very fast." [Pl.Exh. 1205 at pp. 7–8]. When asked if Yule disclosed the amount of risk associated with a purchase of American Network stock, Garrette testified that "[h]e didn't talk about risk. He seemed to think that it was a sure bet, that it was going to go up and there wasn't any doubt in his mind about it because of the things he knew that he couldn't tell me." [Pl.Exh. 1205 at p. 9]. Based upon Yule's representations, Garrette purchased 1,000 shares of American Network at $2¾ per share on or about July 28, 1989. [Pl.Exh. 1205 at p. 10; Pl.Exh. 304 at 7/28/89]. From the beginning of 1989 through July 1, 1990, the bid price for American Network common stock

never went above $2½ per share. [Pl.Exh. 2602 at p. 74]. Yule's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 304 at 7/28/89].

In or about September 1989, Yule recommended that Meyers purchase Med–Mobile stock. [Trial at p. 59]. Yule told Meyers that "this was a winning stock," that the stock price would rise rapidly and go into the "double digits" after the "first of the year" and that no risk was involved in an investment in the stock. [Trial at p. 59; Pl.Exh. 1202 at p. 11]. Yule further told Meyers that he expected the price of the stock to rise to $13 or $14. [Pl.Exh. 1202 at p. 11]. Based upon Yule's representations, Meyers purchased 1,000 Med–Mobile shares at $4 per share on or about September 1, 1989. [Trial at p. 61; Pl.Exh. 301 at 8/25/89]. From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never exceeded $3 per share. [Pl.Exh. 2602 at p. 220]. Yule's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 301 at 8/25/89].

Yule testified at trial that he told Meyers "that it was my opinion and that it was our research department's opinion that the company [Med–Mobile], once it started making money, would trade higher in price, had the potential to trade higher in price." [Trial at p. 891–892].

In or about September 1989, Yule recommended that Garrette purchase Med–Mobile stock. [Pl.Exh. 1205 at pp. 14–15]. Yule told Garrette that "[y]ou are going to really miss the boat if you don't buy something, because this stock is really going to go in six months or less." [Pl.Exh. 1205 at p. 15]. Yule further told Garrette that the stock price would rise into the "double digits" or over $10 a share within six months. [Pl.Exh. 1205 at p. 15]. Based upon Yule's representations, Garrette purchased 1,000 shares of Med–Mobile at $4 per share on or about September 5, 1989. [Pl.Exh. 1205 at p. 16; Pl.Exh. 304 at 9/29/89]. In connection with this purchase, Garrette testified that "the only reason that I bought the stock was because of his projections, what he told me." [Pl.Exh. 1205 at p. 16]. From

the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never exceeded $3 per share. [Pl.Exh. 2602 at p. 220]. Yule's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 304 at 9/29/89].

Yule testified that he told Garrette "it was my opinion that I thought the stock [Med–Mobile] had some appreciation potential and would trade higher." [Trial at pp. 957–960].

In or about September 1989, Yule recommended that Caulfield purchase shares of Med–Mobile stock. [Trial at p. 102; Pl. Exh. 305 at 9/29/89]. Yule told Caulfield that Med–Mobile "was a laboratory primarily engaged in testing, focusing on blood testing, and that they did AIDS testing; that this was the technology of the future and that they were expanding," and that stock price would "sky rocket." [Trial at p. 103]. Yule guaranteed Caulfield that Med–Mobile was a "risk free investment." [Trial at p. 103]. Based upon Yule's representations, Caulfield purchased 600 shares of Med–Mobile stock at $3⁹⁄₁₆ per share on or about September 19, 1989. [Trial at p. 104; Pl.Exh. 305 at 9/29/89]. Yule's commission on the trade was approximately 9% of the purchase price. [Pl.Exh. 305 at 9/29/89].

In or about September 1989, Sensibaugh asked Yule why American Network stock had not moved up in price as Yule had predicted. [Pl.Exh. 1203 at p. 16]. In response, Yule told Sensibaugh that "it was going to hit any day, to hang in there, that nothing had changed materially." Yule further told Sensibaugh that American Network was experiencing some delays in an acquisition, but that once it "was finalized," the stock price of American Network should at least double. [Pl.Exh. 1203 at p. 16].

In or about September 1989, Yule recommended that Sensibaugh purchase Phonetel warrants. [Pl.Exh. 1203 at p. 16]. Yule told Sensibaugh that he was sure the price of Phonetel warrants would rise approximately 15% or 20% in one month to 45 days. Sensibaugh agreed to purchase 2,000 Phonetel warrants. At the time that

Sensibaugh authorized this purchase, he told Yule that he had to have the money back by the end of October 1989. Yule responded that this was "no problem" because the profit on Sensibaugh's purchase of the Phonetel warrants would be 15 to 20 percent in 30 to 45 days maximum. [Pl. Exh. 1203 at pp. 16–17]. Based upon Yule's representations, Sensibaugh purchased 2,000 Phonetel warrants at $7 each on or about September 6, 1989. [Pl.Exh. 1203 at pp. 16–17; Pl.Exh. 302 at 9/29/89]. Yule's commission on the trade was approximately 5% of the purchase price. [Pl. Exh. 302 at 9/29/89].

In or about September 1989, Yule recommended that Sensibaugh purchase Med–Mobile stock. [Pl.Exh. 1203 at p. 18]. Yule told Sensibaugh that Med–Mobile's involvement in AIDS testing and new doctors hired by Med–Mobile would make Med–Mobile attractive as a takeover target. Yule told Sensibaugh that the price of Med–Mobile should "double almost immediately" and be in the $12 to $15 range within a three month period. Yule advised Sensibaugh to purchase Med–Mobile immediately. [Pl.Exh. 1203 at p. 19]. Based upon Yule's representations, Sensibaugh purchased 1,000 shares of Med–Mobile at $4 per share on or about September 7, 1989. [Pl.Exh. 1203 at p. 20; Pl.Exh. 302 at 9/29/89]. From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never went above $3 per share. [Pl.Exh. 2602 at p. 220]. Yule's commission on the trade was approximately 13% of the purchase price. [Pl.Exh. 302 at 9/29/89].

In or about September 1989, Yule recommended that Sensibaugh purchase Phonetel stock. [Pl.Exh. 1203 at p. 23]. Yule told Sensibaugh that once the Phonetel warrants were exercised "it would go through the roof and at least double by the first quarter of 1990 and that after these warrants were exercised, it would be a $12 to $15 per share stock." [Pl.Exh. 1203 at p. 23]. Based upon Yule's representations, Sensibaugh purchased 1,000 shares of Phonetel common stock at $4 per share on or about September 29, 1989. [Pl.Exh. 1203 at p. 24; Pl.Exh. 302 at 9/29/89]. From the beginning of 1989 through July 1, 1990, the bid price for Phonetel common stock never exceeded $4½ per share. [Pl.Exh. 2602 at p. 1297]. Yule's commission on the trade was approximately 11% of the purchase price. [Pl.Exh. 302 at 9/29/89].

In or about October 1989, Yule recommended that Caulfield purchase additional shares of Med–Mobile stock. [Trial at p. 105; Pl.Exh. 305 at 10/27/89]. Yule told Caulfield "that the stock had not yet made its move" and that Caulfield still had a chance "to get on board on the ground before we hit a home run" and "before it went into the double digits." [Trial at p. 105]. Based upon Yule's representations, Caulfield purchased an additional 935 shares of Med–Mobile stock at $3⅞ per share on or about October 12, 1989. [Trial at p. 106; Pl.Exh. 305 at 10/27/89]. From the beginning of 1989 through July 1, 1990, the bid price for Med–Mobile common stock never exceeded $3 per share. [Pl.Exh. 2602 at p. 220]. Yule's commission on the trade was approximately 11% of the purchase price. [Pl.Exh. 305 at 10/27/89].

In or about October 1989, Sensibaugh told Yule that he wanted his investment in Phonetel warrants returned by the end of October. Yule told Sensibaugh that he should not sell the Phonetel warrants because they still "hadn't made their move" but that they would do so soon and at that time they would rise in price by, at least, 15 or 20 percent. After several more conversations, Yule agreed to sell the warrants. [Pl.Exh. 1202 at pp. 23–24].

In or about November 1989, Yule recommended that Hirsch purchase American Network stock. [Pl.Exh. 1205 at p. 16]. Yule told Hirsch that American Network was "a great stock" that would "skyrocket" in price. [Pl.Exh. 1204 at p. 16]. Based upon Yule's representations, Hirsch purchased 2,000 shares of American Network stock at $2⅝ per share on or about November 10, 1989. [Pl.Exh. 1204 at p. 16; Pl.Exh. 303 at 11/24/89]. From the beginning of 1989 through July 1990, the bid price for American Network common stock never exceeded $2½ per share. [Pl.Exh. 2602 at p. 74]. Yule's commission on the

trade was approximately 14% of the purchase price. [Pl.Exh. 303 at 11/24/89].

In or about November 1989, Yule recommended that Meyers purchase American Network stock. [Trial at p. 62]. Yule told Meyers that American Network would be in the "double digits" in approximately six months time. [Trial at p. 64]. During a conversation regarding American Network, Meyers informed Yule that he was diagnosed with a brain tumor and was going into the hospital for surgery to remove it. Meyers informed Yule that this operation was life threatening. [Trial at p. 65; Pl. Exh. 1202 at pp. 26–27]. Yule responded that American Network was "not a risk situation," and that an investment in American Network would protect Meyers' family. [Trial at pp. 65–66]. Based upon Yule's representations, Meyers purchased 1,000 shares of American Network at $2⅝ per share on or about November 3, 1989. [Pl.Exh. 1202 at p. 29; Pl.Exh. 301 at 11/24/89]. Yule's commission on the trade was approximately 14% of the purchase price. [Pl.Exh. 301 at 11/24/89].

Yule testified at trial that he told Meyers that he thought American Network "would trade a lot higher than the $2½, $2⅝ price that you could pay for it at that point." Yule further testified at trial that he told Meyers that he was "absolutely convinced" that American Network "would do that." [Trial at p. 900].

In or about November 1989, Yule recommended that Garrette purchase additional shares of American Network stock. [Pl. Exh. 1205 at p. 21]. Yule told Garrette that American Network was a "tremendous buy" and that the price of American Network would "hit double digits within six months." [Pl.Exh. 1205 at p. 21]. Yule did not disclose to Garrette the risks associated with a purchase of American Network stock. [Pl.Exh. 1205 at p. 21]. Yule further told Garrette that he could sell American Network shares to him at $2¾ per share when the stock was actually selling for $4 per share. [Pl.Exh. 1205 at p. 22]. Based upon Yule's representations, Garrette purchased 2,000 shares of American Network at $2⅝ per share on or about November 9, 1989. [Pl.Exh. 1205 at p. 22; Pl.Exh. 304 at 11/24/89]. From the beginning of 1989 through July 1990, the bid price for American Network common stock never exceeded $2½ per share. [Pl.Exh. 2602 at p. 74]. Yule's commission on the trade was approximately 14% of the purchase price. [Pl.Exh. 304 at 11/24/89].

In or about late November 1989, Yule recommended that Sensibaugh purchase additional shares of Phonetel stock. [Pl. Exh. 1203 at pp. 27–28]. Yule told Sensibaugh that Phonetel stock was "going to go through the roof" and that it would "double before the end of the first quarter of 1990." [Pl.Exh. 1203 at pp. 26–27]. Yule told Sensibaugh that John Moran was "really hot on this stock," that John Moran was so certain of a price rise in the stock that he held a "portion" of the stock in his personal portfolio, and that John Moran "guaranteed to buy the shares back" if the price of Phonetel stock did not increase by the end of the first quarter of 1990. Yule stated that, by making this recommendation, he was trying to make up for the Phonetel warrant recommendation that had not increased in price by 15 or 20 percent as Yule had predicted. [Pl.Exh. 1203 at pp. 27–28]. Based upon Yule's representations, Sensibaugh purchased 2,000 shares of Phonetel at $4½ per share on or about December 1989. [Pl.Exh. 1203 at p. 29; Pl.Exh. 301 at 12/31/89]. From the beginning of 1989 through July 1, 1990, the bid price for Phonetel common stock never went above $4½ per share. [Pl.Exh. 2602 at p. 1297]. Yule's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 302 at 12/31/89].

In or about December 1989, Yule recommended that Steel purchase shares of Phonetel stock. [Pl.Exh. 1206 at p. 9]. Yule told Steel that Phonetel was going to "take off" and that the stock was "going to go crazy." [Pl.Exh. 1206 at p. 9]. Yule further told Steel that he could see returns of $50,000 to $60,000 on a $25,000 Phonetel investment in five to six months time. [Pl. Exh. 1206 at p. 12]. Yule also told Steel that he could double or triple his money with an investment in Phonetel. [Pl.Exh. 1206 at p. 13]. Yule did not disclose to

Steel the risks associated with a purchase of Phonetel common stock. [Pl.Exh. 1206 at p. 14]. Based upon Yule's representations, Steel purchased 2,000 shares of Phonetel at $4½ per share on or about December 21, 1989. [Pl.Exh. 1206 at p. 15; Pl. Exh. 306 at 12/31/89]. From the beginning of 1989 through July 1, 1990, the bid price for Phonetel common stock never exceeded $4½ per share. [Pl.Exh. 2602 at p. 1297]. Yule's commission on the trade was approximately 12% of the purchase price. [Pl.Exh. 306 at 12/31/89].

In or about late December 1989, Yule recommended that Meyers purchase additional shares of Med–Mobile stock. [Pl. Exh. 1202 at p. 31]. Yule told Meyers that the price of Med–Mobile was going down, but that Meyers could "recoup" losses on prior investments by buying Med–Mobile shares at a "bargain rate." Yule further told Meyers that Meyers would recoup his losses on his previous Med–Mobile purchase when the price of Med–Mobile went to "double digits" after the first of the year. [Pl.Exh. 1202 at p. 31–32]. Yule also suggested to Meyers that he borrow money to finance additional stock purchases. [Trial at p. 76]. Meyers decided not to purchase additional Med–Mobile shares at that time. [Pl.Exh. 1202 at p. 33].

In or about August 1990, Yule recommended that Snedegar purchase shares of Engineered Support System Inc. ("Engineered"). [Pl.Exh. 1207 at p. 16]. Yule told Snedegar that "the company was expected to have a large government contract immediately, it should be announced any day and that is why we should buy the stock immediately." [Pl.Exh. 1207 at p. 16]. Yule further told Snedegar that based on this government contract "the stock would go up several points immediately." [Pl.Exh. 1207 at pp. 16–17]. Based upon Yule's representations, Snedegar purchased 3,000 shares of Engineered at $6⅞ per share. [Pl.Exh. 1206 at pp. 16–17].

#### 4. *Vuono*

In or about January 1989, Vuono told Guggino that the price of Med–Mobile warrants, then trading at $3.25 per share,

would rise to between $4.50 and $5 per share in a few months. During this conversation, Vuono did not disclose to Guggino the fact of Med–Mobile's historical losses. When Guggino asked Vuono how he knew the price of Med–Mobile would rise, Vuono responded, "You know how to make pizzas. That's you job. And my job as stockbroker is to know things, to know what's going to be happening with the stocks." [Pl.Exh. 1306 at p. 21]. Based upon Vuono's representations, Guggino purchased 509 Med–Mobile warrants at $3.25 each. [Pl.Exh. 1306 at pp. 11–20, 59; Pl.Exh. 404]. In 1989, the bid price for Med–Mobile common stock never exceeded $2⅞ per share. [Pl.Exh. 2601].

In or about February through April 1989, Vuono told St. Clair that the price of American Network should increase by 40% to 50% within one year. Vuono further told St. Clair that American Network was a "slow growth, secure, solid company" and that it was "not a speculative investment." Vuono did not discuss American Network's profits or losses with St. Clair. Based upon Vuono's representations, St. Clair purchased 900 American Network shares at $2¼ per share in or about April 1989. [Trial at pp. 412–413; Pl.Exh. 1304 at pp. 175, 179–180]. From the beginning of 1989 through July 1, 1990, the bid price for American Network common stock never exceeded $2½ per share. [Pl.Exh. 2602].

In or about February through April 1989, Vuono told St. Clair that the price of Healthcare warrants should increase by 30%–50%. Vuono further assured St. Clair that Healthcare warrants were as safe an investment as common stock. Vuono did not disclose Healthcare's historical losses to St. Clair. Rather, he painted "a picture of rosy growth." Based upon Vuono's representations, St. Clair purchased 5,000 Healthcare warrants at $.75 each in or about April 1989. [Trial at pp. 408–411; Pl.Exh. 1304 at pp. 25–41]. From the beginning of 1989 through July 1, 1990, the bid price for Healthcare warrants never exceeded $11/16 per share. [Pl.Exh. 2602].

In or about February through April 1989, Vuono told St. Clair that the price of Med–

Mobile stock should increase by 30%–50%. Based upon Vuono's representations, St. Clair purchased 600 shares of Med–Mobile at $3.50 per share in or about April 1989. [Trial at pp. 405–408; Pl.Exh. 1304 at pp. 51–55, 182]. In 1989, the bid price for Med–Mobile common stock never exceeded $2⅞ per share. [Pl.Exh. 2601].

In or about March 1989, Vuono told Conte that the price of Denning Mobile Robotics, Inc. ("Denning Mobile Robotics"), then selling at $1.50 per share, would increase to $5 per share within six to eight months. Based upon Vuono's representations, on or about March 13, 1989, Conte purchased 2,000 shares of Denning Mobile Robotics at $1.50 per share. [Pl.Exh. 1305 at pp. 10–11]. From the beginning of 1989 through July 1, 1990, the bid price for Denning Mobile Robotics never went above $1⅝ per share. [Pl.Exh. 2602].

On or about May 25, 1989, Vuono told Conte that the price of Borden Chemicals & Plastics, L.P. ("Borden Chemicals") units, then selling at $19⅛ each, would increase to between $23 and $24 per unit in a matter of months. Based upon Vuono's representations, Conte purchased 100 Borden Chemicals units at $19⅛ per unit on or about May 25, 1989. [Pl.Exh. 1305 at pp. 21–22, 39].

On or about September 1, 1989, Vuono told Beck that Med–Mobile stock, then selling at $4 per share, had the potential to go to $8 per share by October/December 1989. During this conversation, Vuono did not disclose Med–Mobile's historical losses to Beck. Based upon Vuono's representations, Beck purchased 250 shares of Med–Mobile at $4 per share. [Pl.Exh. 1308 at pp. 10–15, 21, 23]. In 1989, the bid price for Med–Mobile common stock never went above $2⅞ per share. [Pl.Exh. 2601].

In or about late September or early October 1989, Vuono told St. Clair that the price of Istec should rise from its current price of $4½ per share to $6 per share by early 1990. During this conversation, Vuono did not disclose Istec's historical losses to St. Clair. Based upon Vuono's representations, St. Clair purchased 7,000 Istec shares in two purchases, one at $4½ per share and the other at $4⁹⁄₁₆ per share. [Trial at p. 420; Pl.Exh. 1304 at pp. 185–187]. From the beginning of 1989 through July 1, 1990, the bid price for Istec common stock never exceeded $4⅛ per share. [Pl.Exh. 2602].

In early to mid October 1989, Vuono told Treat that the price of Healthcare stock, then selling at $2⅝ per share, would rise to $3½ per share in a month or two, and told Treat that Healthcare was not a very speculative security. Based upon Vuono's representations, Treat purchased 30,000 shares of Healthcare. [Trial at pp. 313–314]. From the beginning of 1989 through July 1, 1990, the bid price for Healthcare common stock never went above $2⅝ per share. [Pl.Exh. 2602].

In or about early November 1989, Vuono told St. Clair that the price of Phonetel stock should rise to $6 per share. During this conversation, Vuono did not disclose the fact of Phonetel's historical losses to St. Clair. Based upon Vuono's representations, St. Clair purchased 5,000 Phonetel shares at $4.50 per share. [Trial at pp. 426–427, 500–501]. From the beginning of 1989 through July 1, 1990, the bid price for Phonetel common stock never went above $4½ per share. As of October 2, 1990, the closing bid price for this stock was $7⁄₁₆ per share. [Pl.Exh. 2602, 2701].

Vuono was aware that making predictions about future prices of securities is illegal because he correctly answered a question requiring such knowledge on his Series 7 securities licensing examination. [Pl.Exh. 2901].

### E. Misrepresentations Regarding Commissions

Defendants Mecca, Yule, and Vuono falsely told customers that they would not earn commissions on customer securities transactions, or they misrepresented commission rates on customer securities transactions.

#### 1. *Mecca*

When Lambiase asked Mecca about Mecca's trading commissions, Mecca responded that "there was no commission because

there was an in-house stock and [the firm] made their commissions buying and selling that way." Lambiase testified that he did not understand Mecca's explanation. [Trial at 575].

Although the SEC's complaint did not specifically allege that Mecca misrepresented his commissions earned on customer transactions, such a misrepresentation came to light during the course of this litigation. When Cherouvis asked Mecca, "What is your commission and how does it function, how does it work?," Mecca falsely stated that he earned commissions earned on purchases and sales of approximately 3% to 4% of the purchase price. [Trial at p. 171]. In fact, Mecca's commissions averaged approximately 12% of the purchase or sale price. [Pl.Exh. 2801 at ¶ 4–11].

## 2. *Yule*

In or about June 1989, Caulfield asked Yule about the size of the commission he would be charged on a purchase of Istec shares. [Trial at pp. 95–96]. In this regard, Caulfield testified "[t]he first time he told me that I would pay no commission and I asked him how he could manage to sell stock without charging me a commission. And I asked him if he owned the stock or if this was a house stock or purchased on the open market, and he never did give me a direct answer but he said he did not own the stock. And then he said that my commissions would be no more that I would normally pay at my discount brokerage house." [Trial at p. 96]. In fact, on Caulfield's $3,127 purchase of Istec stock, J.T. Moran and Yule split $750 in commissions, which exceeds the commission charged by a discount brokerage firm. [Pl.Exh. 802 at 6/30/89].

In or about July 1989, Yule misled Sensibaugh with respect to the size of Yule's commission on Sensibaugh's purchase of American Network stock. [Pl.Exh. 1203 at p. 15]. In this regard, Sensibaugh testified that "[w]hat I was led to believe is that when the stock was issued, he was not paid a commission on my purchases, that it was only when I would sell them, then he would get his commission out of that. So, a little

bit of profits would go to him." [Pl.Exh. 1203 at p. 15]. In fact, J.T. Moran and Yule split $700 in commissions on Sensibaugh's $2,752 purchase of American Network stock. [Pl.Exh. 302 at 8/25/89].

## 3. *Vuono*

In or about April 1989, Vuono told St. Clair that he would not make a commission on St. Clair's purchase of Healthcare warrants. [Trial at pp. 408–409; Pl.Exh. 1304 at pp. 176–178]. In fact, Vuono made approximately $937.50 on St. Clair's purchase of approximately $3,750 worth of Healthcare warrants. [Pl.Exh. 2801 at ¶ 14.f.]. In or about April 1989, Vuono told St. Clair that he would not make a commission on St. Clair's purchase of American Network warrants. [Trial at p. 414; Pl.Exh. 1304 at 179–180]. In fact, Vuono made approximately $140.40 on St. Clair's purchase of approximately $2,025 worth of American Network warrants. [Pl.Exh. 2801 at ¶ 14.g.]. In or about September or October 1989, Vuono told St. Clair that he would not make a commission on St. Clair's purchase of Istec common stock. [Trial at pp. 420–421; Pl.Exh. 1304]. In fact, Vuono made approximately $4,850 on St. Clair's purchase of approximately $31,000 worth of Istec common stock. [Pl.Exh. 2801 at ¶ 14.h.].

When Treat first began investing through Vuono, he told Vuono that he was displeased with the high commissions that his previous J.T. Moran broker had earned on Treat's stock purchases. [Trial at p. 299; Pl.Exh. 1307 at pp. 27–28]. In or about August 1989, Vuono told Treat that he would not make a commission on a purchase of American Network shares. [Pl.Exh. 1307 at pp. 108–109]. In fact, Vuono made approximately $12,900 on Treat's purchase of approximately $104,000 worth of American Network shares. [Pl.Exh. 2801 at ¶ 14.j.]. In or about August 1989, Vuono told Treat that he would not make a commission on a purchase of Phonetel warrants. [Trial at pp. 302–303; Pl.Exh. 1307 at p. 103]. In fact, Vuono made approximately $350 on Treat's purchase of

approximately $7,000 worth of Phonetel warrants. [Pl.Exh. 2801 at ¶ 14.k.].

In or about January 1989, Vuono told Guggino that he would earn no commission on Guggino's purchase of Med–Mobile warrants. [Pl.Exh. 1306 at pp. 52–52, 63]. Internal J.T. Moran customer statements and Vuono's commission runs indicate that Vuono earned a commission on the purchase of Med–Mobile warrants in January 1989. [Pl.Exh. 404, 901].

In or about March 1989, Vuono falsely stated to Conte that "there wouldn't be" a commission on Conte's purchase of 2000 shares of Denning Mobile Robotics stock. [Pl.Exh. 1305 at pp. 36–38]. In fact, J.T. Moran's internal customer statement for Conte indicates that there was a $1000 commission on Conte's purchase of Denning Mobile Robotics stock. [Pl.Exh. 404].

Vuono testified that when customers asked about commissions on J.T. Moran house stocks, he never disclosed the actual commission that he or J.T. Moran received. [Pl.Exh. 1301 at p. 38].

### F. Omissions Regarding Commissions

The SEC's complaint did not specifically allege that Ben Hasho, Mecca, Yule, or Vuono omitted to disclose the size of their commissions. During the course of this litigation, however, it became clear that they failed to disclose to customers the commissions they earned on customer transactions in house stocks. [Trial at p. 655; Pl.Exh. 1003 at pp. 13–14; Pl.Exh. 1002 at p. 11; Pl.Exh. 1004 at p. 42; Pl. Exh. 1001 at pp. 28, 57–60; Trial at pp. 288, 575, 576, 618, 848; Trial at pp. 61, 1018; Pl.Exh. 1201 at p. 48; Pl.Exh. 1202 at pp. 22, 29; Pl.Exh. 1203 at pp. 19, 20, 29; Pl.Exh. 1205 at p. 12; Pl.Exh. 1206 at pp. 16, 18; Trial at pp. 303, 304, 310, 315407, 409–410, 414–415, 420, 421, 424, 428, 430–31; Pl.Exh. 1304 at pp. 179–180, 184, 188–189, 195; Pl.Exh. 1307 at pp. 16, 27, 28, 105, 107, 109–110; Pl.Exh. 1306 at pp. 52–53, 63; Pl.Exh. 1305 at pp. 36–38, 43; Pl. Exh. 1308 at pp. 15–16]. No documents provided to customers by securities firms employing defendants Ben Hasho, Mecca, Yule, and Vuono disclosed the commissions these defendants earned on customer transactions in house stocks. [Pl.Exh. 100–300 series; Trial at pp. 304, 412, 428].

### G. Unauthorized Trades

Defendants Ben Hasho, Mecca, Yule and Vuono purchased and sold securities for customers without customer authorization and they used high pressure sales tactics and made fraudulent statements to induce customers to ratify such unauthorized transactions.

#### 1. Ben Hasho

In or about June 1989, Ben Hasho opened, without Como's authorization, an account in Como's name. [Pl.Exh. 1004 at p. 38; *see* Pl.Exh. 107]. From in or about June 1989 to January 1990, Ben Hasho executed, without Como's authorization, securities transactions in J.T. Moran Financial securities, Phonetel securities, and EMS securities in this account. [Pl.Exh. 107; Pl.Exh. 1004 at pp. 38–40]. Como testified that "in February [1990], I believe, when I discovered that J.T. Moran went bankrupt. I went back to my files and I started looking through the monthly statements and I realized there were two different accounts on the monthly statement cards ... They had never made me aware it was two accounts instead of one." [Pl. Exh. 1004 at p. 38; Pl.Exh. 107].

In or about September 1989, Ben Hasho recommended that Tate purchase Advanced Products stock. [Trial at p. 656]. Tate declined to purchase Advanced Products stock because he was dissatisfied with the performance of Med–Mobile, which he had purchased previously through Ben Hasho. [Trial at pp. 657–658]. Soon thereafter, Tate received a confirmation in the mail indicating that 1,000 shares of Advanced Products had been purchased for his account. [Trial at p. 658]. When Tate confronted Ben Hasho with this unauthorized trade, Ben Hasho attempted to get Tate to ratify the purchase. [Trial at p. 658]. Tate did not ratify the purchase and returned the confirmation to J.T. Moran. [Trial at p. 658].

In or about mid-September 1989, Poff instructed Ben Hasho to sell all of the securities in his J.T. Moran account. [Pl. Exh. 1003 at p. 26]. Pursuant to Poff's instructions, Ben Hasho liquidated various positions in Poff's J.T. Moran account and with some or all of the proceeds made securities purchases without Poff's authorization. On or about September 14, 1989, Ben Hasho purchased 2,300 shares of Med–Mobile at $2¹³⁄₁₆ per share. Poff testified that "in one instance ... he had sold 3,000 shares of my Advanced Products and Technologies at about $1¹⁵⁄₁₆. That's the ones I purchased for $2¼. So I lost $1560 on that. And I didn't receive any check. My statement showed that the proceeds were used to purchase 2300 shares of Med–Mobile at $3¹³⁄₁₆, which I had not authorized." [Pl.Exh. 1003 at p. 25; Pl.Exh 103 at 9/29/89]. On or about October 25, 1989, Ben Hasho purchased 9,200 shares of Med–Mobile at $3⁵⁄₈ per share without Poff's authorization. [Pl.Exh. 1003 at p. 28; Pl.Exh. 103 at 10/27/89]. On or about November 17, 1989, Ben Hasho purchased 9,200 shares of Med–Mobile at $3⁵⁄₈ per share without Poff's authorization. [Pl.Exh. 1003 at p. 29; Pl.Exh. 103 at 10/27/89].

When Poff confronted Ben Hasho about the unauthorized purchases of Med–Mobile stock, Ben Hasho told him that it was "still going through the roof and was going to explode in price anytime." [Pl.Exh. 1003 at p. 29]. Ben Hasho further told Poff that he expected the price of the stock to rise to $20 to $30 per share. [Pl.Exh. 1003 at p. 31]. When Poff asked Ben Hasho why he had purchased Med–Mobile in his account without authorization, Ben Hasho said he "thought it was the right thing to do" for Poff at the time. Poff then told Ben Hasho that he had not authorized him to do it and that his actions were "ridiculous." Ben Hasho responded, "it was an impromptu thing. It just came up." [Pl.Exh. 1003 t p. 32].

In or about October 1989, Ben Hasho recommended that Como purchase Healthcare stock. Como declined to do so. [Pl. Exh. 1004 at p. 32]. Following this conversation, Ben Hasho sold, without Como's authorization, Como's Istec securities and

used the proceeds to purchase, without Como's authorization, 750 shares of Healthcare common stock at $2⁷⁄₈ per share on or about October 12, 1989. [Pl.Exh. 106 at 10/27/89; Pl.Exh. 1004 at pp. 32–33]. Como spoke to Ben Hasho and complained about the transactions. Ben Hasho responded that it was time to sell the Istec stock because of a new contract that Healthcare had made and as a result "was to be taking off rather soon." [Pl.Exh. 1004 at p. 32]. Como allowed the trade to stand because Como took Ben Hasho's word that he was looking out for Como's "best interest." [Pl.Exh. 1004 at p. 33]. Ben Hasho's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 106 at p. 10/27/89].

On or about December 23, 1989, Ben Hasho recommended that Poff purchase Phonetel stock. [Pl.Exh. 1003 at p. 33]. Ben Hasho told Poff that Phonetel "would go through the roof." [Pl.Exh. 1003 at p. 33]. Ben Hasho further told Poff that he only had a "certain amount of it [Phonetel]" that he could "turn loose" at that particular time, and that "it was going fast." Poff declined to purchase Phonetel stock at that time. In this regard, Poff testified: "I assured him at that time what I had assured him before, that I did not have the money. I did not want the stock. And would not buy the stock. And I wanted my securities sold and to get out." [Pl. Exh. 1003 at p. 33]. Upon receipt of his December 1989 customer statement, Poff found that Ben Hasho had purchased 5,000 shares of Phonetel at $4 per share in his account without his authorization. [Pl. Exh. 1003 at pp. 33–34; Pl.Exh. 103 at 12/31/89]. Ben Hasho's commission on the trade was approximately 12% of the purchase price. [Pl.Exh. 103 at 12/31/89].

In or about December 1989, Ben Hasho recommended that Como purchase additional shares of Phonetel stock. [Pl.Exh. 1004 at p. 34]. Como declined this recommendation. [Pl.Exh. 1004 at p. 35]. Nevertheless, 1,000 shares of Phonetel common stock were purchased in this account without his authorization. [Pl.Exh. 1004 at p. 35; Pl.Exh. 106 at 12/31/89]. Ben Hasho's

commission on the trade was approximately 12% of the purchase price. [Pl.Exh. 106 at 12/31/89].

### 2. *Mecca*

In or about early February 1989, Mecca recommended that Natoli purchase shares of American Network stock during the course of several conversations. During these conversations, Mecca failed to disclose that American Network had lost $281,000 for the 6 months that ended September 30, 1988 and that American Network had defaulted on a $900,000 bank loan in November 1988. [Trial at p. 621; Pl.Exh. 2301 at pp. 7, 50]. Natoli told Mecca that he did not want to order any American Network stock. [Trial at pp. 618–619]. Shortly thereafter, Natoli received by mail a confirmation for the sale of 700 Phonetel shares that had been in his account and a confirmation for a purchase of American Network shares. Natoli called Mecca and told him that he had not authorized either the sale of the Phonetel or the purchase of American Network shares. Mecca told Natoli that the trade had been a mistake, but that Natoli should allow the trade to stand because he expected American Network to perform better than the Phonetel. [Trial at pp. 619, 637–638]. Based upon Mecca's representations, Natoli agreed to let the unauthorized trades stand. Mecca's commission on the American Network purchase was 15% of the purchase price. [Pl.Exh. 203 at 2/28/89].

In or about March or April 1989, Cherouvis called Mecca and informed Mecca that he was interested in purchasing a stock that a friend had recommended. [Trial at p. 184; Pl.Exh. 3001 at ¶ 55]. In response, Mecca recommended that Cherouvis purchase Galagraph Ltd. ("Galagraph") securities. Cherouvis refused to purchase the Galagraph securities and insisted that Mecca purchase the stock his friend had recommended. [Trial at p. 184]. Cherouvis subsequently received an April 1989 customer statement which indicated that 17,650 Galagraph warrants had been purchased in his account. [Trial at pp. 184–184; Pl.Exh. 3001 at ¶ 59]. Cherouvis called Mecca and

asked him what the Galagraph securities were doing in his account. Mecca responded that Cherouvis had ordered the Galagraph securities. [Trial at p. 185]. Although Mecca told Cherouvis that he would eliminate the trade, the trade was never eliminated from Cherouvis' account. [Trial at pp. 185–186; Pl.Exh. 3001 at ¶ 61]. Mecca's commission on the trade was approximately 20% of the purchase price. [Pl.Exh. 207 at 28/28/89, 3/31/89, 4/28/89].

In or about November 1989, Mecca recommended that Alexander purchase Galagraph securities. [Pl.Exh. 1102 at p. 32]. He also recommended that Alexander sell Federal National Mortgage Association ("Fannie Mae") warrants and use the proceeds to purchase the Galagraph shares. Alexander declined to make these trades. In or about January 1990, Alexander discovered that the Fannie Mae warrants had been sold and the proceeds used to purchase 1,300 Galagraph shares. [Pl.Exh. 1102 at pp. 35–36; Pl.Exh. 204 at 11/24/89]. Alexander did not authorize the sale of the Fannie Mae warrants or the purchase of the Galagraph securities, nor did he receive a confirmation for these trades at the time they occurred. [Pl.Exh. 1102 at pp. 35–37, 39]. These unauthorized transactions occurred in late November 1989. [Pl.Exh. 1102 at p. 37]. Mecca's commission on the unauthorized purchase of Galagraph was approximately 20% of the purchase price. [Pl.Exh. 204 at 11/24/89; Pl.Exh. 704].

### 3. *Yule*

In or about March 1989, pursuant to Yule's recommendation, Hirsch purchased shares of Bethlehem Steel stock. [Pl.Exh. 1204 at p. 14]. In mid-April 1989, Yule recommended that Hirsch purchase shares of Med–Mobile stock. [Pl.Exh. 1204 at p. 14]. In response, Hirsch told Yule that "the only way I was going to buy Med–Mobile would be if he could sell Bethlehem Steel at a profit or at least certainly not a loss to me." Yule told Hirsch he would "wait and sell Bethlehem Steel when that could take place." [Pl.Exh. 1204 at p. 15]. Yule did not follow Hirsch's instructions.

Instead, he sold the Bethlehem Steel and purchased the Med–Mobile at a net loss to Hirsch. [Pl.Exh. 1204 at p. 16]. When Hirsch confronted Yule with these unauthorized trades, Yule told him that he "would make it up to me on the next one." [Pl.Exh. 1204 at p. 15; *see* Pl.Exh. 303 at 4/28/89].

In or about December 1989, Garrette authorized Yule to purchase 2,000 shares of American Network stock. [Pl.Exh. 1205 at p. 22]. Garrette remitted payment for this purchase late and the purchase was cancelled. [Pl.Exh. 1205 at p. 24]. Yule used these funds to purchase 1,300 Istec Shares without Garrette's authorization. [Pl.Exh. 1205 at p. 24; Pl.Exh. 304 at 12/31/89]. Garrette testified that when he confronted Yule with this trade, "[h]e" told me basically that it was a sound purchase and that he had to transfer because of the money being received late for the previous purchase, that he chose to do something with it, to put me in a good position. So he bought this Istec." [Pl.Exh. 1205 at p. 25]. Yule's commission on the trade was approximately 15% of the purchase price. [Pl.Exh. 304 at 12/31/89].

### 4. *Vuono*

In or about July or August 1989, Vuono purchased, without Conte's authorization, 1,000 Healthcare shares at $1.50 per share. When Conte confronted Vuono with this unauthorized trade, Vuono told Conte that it was a mistake, that he would look into it and that he would call him back. Vuono called a few days later and stated that he had researched Healthcare, that it was a good investment, that he expected the price of Healthcare to increase, and that Conte should sell his Borden Chemicals units and use the proceeds to pay for the unauthorized Healthcare purchase. Based upon Vuono's representations, Conte sold his Borden Chemicals units and used the proceeds to pay for the unauthorized purchase of 1,000 Healthcare shares. [Pl.Exh. 1305 at pp. 23–28, 3–42; Pl.Exh. 403 (Conte customer statements) at dates 6/30/89—8/25/89].

In or about September through November 1989, Vuono made a number of unauthorized purchases for Treat and Conte. On or about September 12, 1989, Vuono purchased, without Treat's authorization, 5,000 Healthcare shares at $2 3/16 per share. [Pl.Exh. 1307 at p. 94; Pl.Exh. 405 at 9/29/89; Def. Vuono's Exh. C]. In or about October 1989, Vuono purchased, without Treat's authorization, 3000 Med–Mobile shares at $3 5/8 per share. [Trial at pp 384, 392–393; Pl.Exh. 1307 at 94–95; Pl.Exh. 405 at 10/29/89; Def. Vuono's Exh. C; Def. Vuono's Exh. F]. In or about November 1989, Vuono purchased, without Conte's authorization, 1,000 Galagraph Ltd. ("Galagraph") shares at $2 per share. [Pl. Exh. 1305 at p. 31–32].

In or about late 1989, Vuono opened, without Treat's authorization, a joint account at J.T. Moran in the name of Treat and his wife. [Trial at p. 383; Pl.Exh. 1307 at pp. 91–94, 116–117; Pl.Exh. 405 at 12/31/89—1/26/90; Def. Vuono's Exh. F]. Vuono made the following unauthorized trades in this unauthorized account: (a) In or about December 1989, Vuono purchased 5000 shares of Phonetel stock at $4 1/2 per share; (b) in or about January 1990, Vuono purchased 2500 shares of Galagraph at $2 per share; and (c) in or about January 1990, Vuono purchased 200 Storage Technology Corp. warrants at $15 1/8 each. [Trial at p. 383–384, Pl.Exh. 405 at 12/31/89—1/26/90; Def. Vuono's Exh. C, F].

In or about early to mid-December 1989, Vuono purchased, without St. Clair's authorization, 2,500 Phonetel shares. When St. Clair confronted Vuono with this unauthorized trade, Vuono told him he had done him a favor by ordering these shares. St. Clair then instructed Vuono to sell the unauthorized 2500 shares of Phonetel. Vuono sold only 2000 shares. When St. Clair asked why only 2000 shares were sold, Vuono responded that a mistake was made, or that St. Clair would lose money on the transaction if all of it had been sold. [Trial at pp. 428–430, 505–506; Pl.Exh. 1304 at pp. 193–194].

## H. Unauthorized Margin Trading

Defendant Vuono purchased securities on margin without customer authorization. Vuono testified that margin trades could be conducted by J.T. Moran without the receipt of a margin agreement by J.T. Moran. [Pl.Exh. 1302 at pp. 26–27]. "Type 2" trades are defined on J.T. Moran/clearing broker customer statements as margin trades. [Pl.Exh. 401–406].

Customer Treat never authorized any trades in his account and he never signed a margin trading authorization agreement. [Trial at pp. 325, 349, 358, 390, 391, 394; Pl.Exh. 1307 at p. 40, 97]. Treat's customer statements indicate that from in or about August through December 1989, Vuono made the following "Type 2" trades, on margin, without Treat's authorization: (a) on or about August 14, 1989, Vuono purchased 200 Holiday Corp. warrants; (b) on or about September 19, 1989, Vuono purchased 400 Upjohn Co. shares; (c) on or about October 23, 1989, Vuono purchased 100 Philip Morris, Inc. shares; (d) on or about November 8, 1989, Vuono purchased 1,000 Biogen Inc. shares; and (e) on or about December 1989, Vuono purchased 600 Fannie Mae warrants. [Pl.Exh. 405].

On Vuono's recommendation, St. Clair verbally authorized Vuono to make the following two trades on margin: (a) the purchase of 700 shares of Federal National Mortgage Association ("Fannie Mae") at $113¾ each in or about September 1989; and (b) the purchase of 250 Fannie Mae Warrants at $75 each, in or about September 1989. [Trial at pp. 415–418, 422, 481–482, 485–486, 490, 492, 499; Pl.Exh. 1304 at pp. 65–66]. Following these two margin trades, however, St. Clair did not authorize Vuono to make any further margin trades. In fact, St. Clair repeatedly told Vuono that he did not want any further trades to be made on margin. Indeed, Vuono repeatedly told St. Clair that no further trades were being made on margin. [Trial at pp. 422–423, 425–426, 431–432, 485–486, 492, 499; Pl.Exh. 1304 at p. 96]. St. Clair, who never signed a margin trading authorization agreement, was unable to understand his J.T. Moran customer statement and relied on Vuono to interpret them. [Trial at pp. 416, 486–487, 490, 493–5, 502; Pl.Exh. 1304 at pp. 68, 98].

St. Clair's customer statements indicate that from on or about October through December 1989, Vuono made the following trades as "Type 2" trades, on margin, without St. Clair's authorization: (a) in or about October 1989, Vuono caused to be purchased on margin, 1,000 Student Loan Marketing Association ("Sallie Mae") warrants; (b) in or about mid October 1989, Vuono caused 100 Delta warrants to be purchased on margin; (c) in mid to late October 1989, Vuono caused 200 Fannie Mae warrants to be purchased on margin; and (d) in or about mid December 1989, Vuono caused 500 Fannie Mae warrants to be purchased on margin. [Pl.Ex. 401].

## I. Failure to Sell or Difficulty Selling

On various occasions, defendants Ben Hasho, Mecca, Yule, and Vuono discouraged customer sell orders through high pressure sales tactics and through false and misleading statements, and at times refused to execute customer sell orders.

### 1. Ben Hasho

In or about late August and early September 1989, after reading his customer statements, Poff asked Ben Hasho why all the stocks in his portfolio were declining in price. [Pl.Exh. 1003 at p. 23]. In response, Ben Hasho tried to assure Poff that the prices of Poff's holdings had increased even though Poff's statement indicated otherwise. [Pl.Exh. 1003 at p. 23]. Ben Hasho said "the stock was fluctuating" and while at the time Poff received his statement his holdings had decreased in value, his portfolio had since increased. [Pl.Exh. 1003 at p. 24]. In or about the second week of September 1989, Poff informed Ben Hasho that he wanted to sell all the securities in his J.T. Moran account because these securities were declining in price and he couldn't's afford the losses. [Pl.Exh. 1003 at p. 24]. Ben Hasho told Poff "I'll take care of it." [Pl.Exh. 1003 at p. 24]. Ben Hasho eventually sold Poff's securities beginning in or about mid Sep-

tember 1989. However, Ben Hasho used the proceeds from these sales to finance various unauthorized purchases of other securities. [Pl.Exh. 1003 at pp. 25–33].

In or about late 1989, based on the fact that his Med–Mobile stock was declining in price, Tate requested during four or five conversations with Ben Hasho "that he sell it and send me the money or just send me the certificates for the stock." [Trial at p. 661]. Tate testified that Ben Hasho told him that it was not his firm's policy "to sell the stock at the customer's wish because they [the firm] had a policy of building up a portfolio for the customers that would give them a big profit ... that the stocks they picked were excellent and exclusive stocks, and it would definitely show a profit in a short time." [Trial at p. 661]. Tate further testified "I haven't ever received any certification. I was never able to sell them, and there's a total deterioration now of all the monies that was involved. It's completely gone." [Trial at p. 661].

In or about December 1989, after reading his customer statements, Tlusty noticed that all of the stocks that he purchased through Ben Hasho had declined in price. [Pl.Exh. 1005 at p. 20]. Tlusty called Ben Hasho with the purpose of selling these stocks. In response, Ben Hasho told him it "was a temporary set back," and that his stocks would "rebound." [Pl.Exh. 1005 at pp. 20, 21]. He strongly encouraged Tlusty not to sell. [Pl.Exh. 1005 at pp. 20, 21]. Tlusty testified that based upon Ben Hasho's representations, "I did not sell, which was my intention when I called him." [Pl.Exh. 1005 at p. 21]. The next time that Tlusty spoke to Ben Hasho was after J.T. Moran went out of business. [Pl.Exh. 1005 at p. 21].

After receiving his December 1989 statement from J.T. Moran, Leatherbury called Ben Hasho to inquire about selling his securities due to the fact that his portfolio value had declined considerably. [Pl.Exh. 1002 at p. 22]. Ben Hasho responded that "it was not time to sell and that it was a temporary drop that it would be gained back shortly." [Pl.Exh. 1002 at p. 22]. Based upon Ben Hasho's representations,

Leatherbury did not sell any of his securities, and the next time they spoke was after J.T. Moran had gone out of business. [Pl.Exh. 1002 at p. 23].

### 2. *Mecca*

In or about May 1989, Natoli contacted Mecca and told him that he wanted Mecca to liquidate the holdings that he had purchased through J.T. Moran. Mecca responded that Natoli should not sell because "the market was going up .. [and] it was a bad time to get out of the market." Natoli then "negotiated" with Mecca to sell his securities, finally agreeing to sell only his American Network holdings. [Trial at p. 622]. In the summer of 1989, Natoli called Mecca and again told him that he wanted to sell his entire portfolio. Mecca responded, "I can't do it ... I can't explain why, but what I'll do is I'll send you the stock and you sell it through another broker. It will cost you less money." Natoli agreed to do this and asked Mecca to deliver his stock. Most of Natoli's stock was delivered by November 1989. By November 1989, however, Natoli's Universal Holding Corp. ("Universal Holding") stock still had not been delivered. In or about December 1989, Mecca agreed to sell Natoli's Universal Holding stock directly. Mecca never warned Natoli that he would resist selling those stocks at a later date. [Trial at pp. 623, 729–731].

In or about October 1988, Lambiase called Mecca and told Mecca that he wanted to sell his Istec holdings. [Trial at pp. 570–571]. Mecca told Lambiase that he could sell Istec only if Lambiase purchased Phonetel with the proceeds of the Istec sale. [Trial at pp. 572–574]. In or about late 1989, Lambiase told Mecca that he wanted to sell the holdings that he had purchased through Mecca. [Trial at p. 574]. Mecca told Lambiase that he did not want to sell his holdings. Lambiase testified, "He ... tried to talk me into staying with the company and keeping it in there, that everything would definitely go up." Lambiase then told Mecca that he would contact the SEC if Mecca did not sell his holdings. Mecca finally agreed to sell; Lambiase's positions were liquidated ap-

proximately one week later. [Trial at p. 575]. At the time of Lambiase's stock purchases, Mecca never warned Lambiase that Mecca would resist selling those stocks at a later date. [Trial at pp. 577–578].

In or about 1988 or 1989, Cherouvis asked Mecca to sell stocks because his son was "born with a malfunction in his eyes" and Cherouvis needed money to fund a corrective operation. [Trial at p. 188; Pl. Exh. 3001 at ¶¶ 68–69]. Mecca suggested that Cherouvis borrow money to invest more and that Cherouvis find the money elsewhere to fund his son's operations. [Trial at p. 188; Pl.Exh. 3001 at ¶ 70]. Mecca never warn Cherouvis that he would resist selling those securities at a later date. In fact, Mecca guaranteed Cherouvis that Cherouvis could sell his "stocks with a phone call at any given time." [Trial at p. 190].

In or about October 1989, Alexander decided that he wanted to transfer his securities from J.T. Moran to another brokerage firm. A broker from another securities firm attempted to procure this transfer on Alexander's behalf. [Pl.Exh. 1102 at pp. 28–31]. When this broker called Mecca on Alexander's behalf, Mecca would not talk to him and denied the receipt of mail sent for the purpose of transferring the account. [Pl.Exh. 1102 at p. 32–31]. Sometime thereafter, Alexander called Mecca personally to assess the status of the account transfer. Mecca told him, "Don't worry about it all, it's safe, you're making a big mistake." [Pl.Exh. 1102 at pp. 32, 34–35]. Alexander's certificates were eventually delivered to him in January 1990. [Pl.Exh. 1102 at p. 39].

In or about October 1989, Costa decided that he wanted to sell securities holdings that he had purchased through Mecca. When Costa called Mecca to tell him this, Mecca recommended that Costa purchase shares of Istec. [Trial at p. 254–255]. Mecca told Costa that Costa could purchase this Istec "commission free" so that Costa would "stay with the account." [Trial at p. 255]. Mecca failed to disclose that Istec had lost money for the year end 1988. [Trial at p. 256]. Mecca also told Costa

that he knew things about Istec that he could not talk about. [Trial at p. 255]. Costa refused to purchase Istec securities. [Trial at p. 256]. Mecca eventually sold Costa's securities. [Trial at pp. 256–258]. Costa received proceeds from all of the sales approximately two months after he initially told Mecca that he wished to sell. [Trial at p. 275].

### 3. Yule

In or about October 1989, Sensibaugh requested that Yule sell the Phonetel warrants that he had previously purchased pursuant to Yule's recommendation. [Pl. Exh. 1203 at pp. 23–24]. Yule told Sensibaugh that he shouldn't sell the Phonetel warrants because "they should be making their move very soon and it should go up at least 15 to 20 percent." [Pl.Exh. 1203 at pp. 23–24]. Sensibaugh testified that "[f]inally, after a couple of conversations over a couple of days period, he finally agreed to sell the warrants. After that, it was going to be a couple of days to process the paperwork and get it all through. He told me he had sold them, but I had not gotten the money, my asset account hadn't been credited. I told him I needed the funds and he said they were going to wire it to me." [Pl.Exh. 1203 at p. 24]. It took two weeks and several phone calls for Sensibaugh to obtain the funds from the sale of the Phonetel warrants. [Pl.Exh. 1203 at p. 26].

In or about late November 1989, Hirsch told Yule that he wanted to sell his Med–Mobile stock. [Pl.Exh. 1204 at p. 17]. Hirsch had difficulty reaching Yule during this period because Yule failed to return Hirsch's telephone calls. [Pl.Exh. 1204 at p. 18]. When Hirsch finally reached Yule and told him that he wanted to sell his Med–Mobile stock, Yule responded that it "would really be a stupid thing to do" and that he should "hold on a little bit longer because things were on track, the company was doing very well, just give it a little more time." [Pl.Exh. 1204 at p. 18]. Based on Yule's representations, Hirsch decided not to sell his Med–Mobile stock at that time. [Pl.Exh. 1204 at p. 18]. The next time that Hirsch spoke with Yule was

after J.T. Moran had gone out of business. [Pl.Exh. 1204 at p. 19].

In or about December 1989, Meyers told Yule that he was concerned about the declining value of his J.T. Moran portfolio. [Trial at p. 69]. Yule responded that Meyers should purchase additional shares of all the stocks in his portfolio, that he should borrow money to do this and that the stock prices would increase. [Trial at pp. 69–76].

#### 4. *Vuono*

In or about late August 1989, Guggino told Vuono to sell his Med–Mobile warrants. Vuono recommended that he not sell at that time because the price of Med–Mobile warrants was still increasing. Guggino told Vuono that he still wanted Vuono to sell the Med–Mobile warrants. Vuono told Guggino that he would sell the warrants and that a check would soon be in the mail. During this time period, Vuono falsely stated to Guggino on numerous occasions that the warrants were trading at the $3–$4 level, when in fact they were trading at under $1. From August 1989 through January 1990, Vuono failed to sell Guggino's warrants. During this time period, Vuono frequently misstated that the Med–Mobile warrants had been sold when, in fact, they had not been sold. [Pl.Exh. 1306 at pp. 24–35; Pl.Exh. 404].

In or about early October 1989, St. Clair ordered Vuono to sell the Fannie Mae securities in his J.T. Moran account. In response, Vuono stated that St. Clair should not sell his Fannie Mae holdings. After a number of conversations, Vuono eventually sold St. Clair's Fannie Mae securities. [Trial at pp. 424–425].

Vuono testified that J.T. Moran managers discouraged J.T. Moran registered representatives from allowing customer to sell

their J.T. Moran house stock holdings. [Pl. Exh. 1301 at pp. 42–48]. Vuono further testified that J.T. Moran managers discouraged J.T. Moran registered representatives from allowing customers to sell J.T. Moran house stock unless the customer's sell order could be "crossed" with a purchase order of another J.T. Moran house stock. [Pl.Exh. 1301 at p. 47].

#### J. Defendants' Arguments

Defendants Ben Hasho, Mecca, and Yule presented a very different version of events than did their customers. The customer witnesses, who had little to gain by testifying, presented a pervasive pattern of fraud by all of the defendants. The testimony of each customer witness corroborated that of the others in significant details, including not only techniques employed but specific language used.

Defendants Ben Hasho, Mecca, and Yule argue in defense that they did none of the things alleged in the SEC's complaint. Mecca and Yule testified at trial; Ben Hasho testified at a deposition. In light of Mecca and Yule's demeanor at trial, all three defendants' explanation of events, and their customers' testimony, I find that these three defendants' testimony regarding their dealings with customers was not credible. I find the argument that these three defendants engaged in none of the alleged activity incredible. In addition, defendant Mecca alleged that "the SEC told [its witnesses] what to say at the trial."[9] Ben Hasho also testified at his deposition that the SEC's witnesses were lying. These unsubstantiated allegations are absurd. Like the other three defendants, Vuono refuses to accept blame for his conduct. Unlike the other three defendants, however, Vuono does not completely deny the SEC's allegations. Rather, he argues

---

**9.** In response to Mecca's allegation, this Court directed the SEC to look into the accusation and report back to the Court. By letter dated July 15, 1991, the SEC reported that a thorough inquiry revealed that the allegation was unfounded.

In a letter dated August 7, 1991, counsel for defendants Ben Hasho, Mecca, and Yule moved for a mistrial, arguing that his clients were prejudiced by the SEC's July 15, 1991 report

because: (1) the report exceeded the Court's directive; and (2) the SEC submitted a post-trial questionnaire of a customer who was neither deposed or a witness at trial as an exhibit to the report.

The SEC's July 15, 1991 letter and attached questionnaire have not been considered as evidence in this case. Accordingly, the motion for a mistrial is denied.

that J.T. Moran was to blame for his conduct. As is discussed in the conclusions of law, this does not excuse Vuono's conduct.

### K. Factors Justifying an Injunction

#### 1. *Ben Hasho*

During the course of this proceedings, Ben Hasho repeatedly denied all the allegations in the SEC's complaint. While he did not testify at trial, Ben Hasho testified at his deposition that his customers lied when they testified about his alleged illegal conduct. [Pl.Exh. 1001 at pp. 105, 128–130]. Ben Hasho testified that his memory of the period he was at J.T. Moran is not very good and that he does not remember specific conversations that he had with customers. [Pl.Exh. 1001 at pp. 96, 105, 117]. He has worked for at least six different brokerage firms since he began in the industry in 1987. [Pl.Exh. 1001 at pp. 13–15 (First Jersey), 22–28 (Sherwood), 37–65 (J.T. Moran), 65–69 (Vanderbilt Securities, Inc. ("Vanderbilt")), 70–71 (Robert Todd Financial Corp. ("Robert Todd")), 71–89 (Stuart–James)].

#### 2. *Mecca*

During trial and deposition, Mecca repeatedly denied the allegations in the SEC's complaint. Mecca testified that he dealt lawfully and ethically with all of his customers. [Trial at pp. 849–850]. Mecca asserted that his customers lied when they testified as to his activities. [Trial at pp. 840–846].

Mecca also testified that he knew it is unlawful to make price predictions. [Trial at pp. 843–844]. Mecca testified that any broker who predicts future price rises of securities to specific levels, who guarantees profits to customers, who guarantees customers against losses on their investments and who engages in unauthorized trading, does not belong in the securities industry. [Trial at pp. 850–851]. Mecca also testified that he wishes to continue working in the securities industry. [Trial at p. 850].

#### 3. *Yule*

Yule's deposition and trial testimony conflict. For example, at his deposition, Yule testified that he had no detailed recollection of his conversation with Steel regarding Phonetel stock. [Pl.Exh. 1201 at p. 201]. At trial, Yule testified in great detail about his conversation with Steel about Phonetel. [Trial at pp. 865–877, 1011–1013]. Further, at his deposition, Yule testified that he did not remember the substance of his conversations with Meyers regarding Med–Mobile. [Pl.Exh. 1201 at pp. 114–115]. At trial, Yule testified in great detail about his conversations with Meyers regarding Med–Mobile. [Trial at pp. 889–894, 1013–1014].

Yule repeatedly denied the allegations in the SEC's complaint, and feels that he treated his J.T. Moran customers fairly. [Trial at p. 1027]. Yule admitted that he understands that price predictions are unethical. He also testified that his customers lied when they testified about his allegedly violative activities. [Pl.Exh. 1201 at p. 101, 132; Trial at pp. 1024–1027]. Yule had worked for at least six different brokerage firms since he began in the industry in 1988. [Pl.Exh. 1201 at pp. 8–20 (Sherwood), 24–69 (J.T. Moran), 69–71 (Vanderbilt) 71–72 (Robert Todd), 72–78, 81–103 (Stuart–James), 103, 108–110 (Chatfield Dean & Co., Inc.)]. Yule plans to return to securities industry. [Pl.Exh. 1201 at p. 203; *but see* Trial at p. 1027 (not sure if he is going to return to securities industry)].

#### 4. *Vuono*

Vuono testified at deposition that he believes that he treated St. Clair fairly and that he did nothing wrong in connection with St. Clair's account. [Pl.Exh. 1303 at pp. 88–89]. Vuono testified at deposition that he believed that he was acting in the best interest of his customers while he worked for J.T. Moran. [Pl.Exh. 1303 at p. 201].

While testifying at deposition, Vuono refused to answer the question whether, in hindsight, he had dealt fairly with his J.T. Moran customers. [Pl.Exh. 1303 at pp. 201–202]. Vuono testified at deposition that, while working for J.T. Moran, he be-

lieved he had a reasonable basis for the stock recommendations he made to the five customers named in the SEC's complaint. [Pl.Exh. 1303 at p. 202]. Vuono testified at deposition that he takes no blame for financial losses suffered by his customers in connection with his investment recommendations made at J.T. Moran. [Pl.Exh. 1303 at pp. 205–206].

### L. Disgorgement Amount

Ben Hasho earned $20,323.37 in commissions in the accounts of Leatherbury, Cardillo, Tate, Como, Tlusty and Poff. [Pl. Exh. 2801 at ¶¶ 4, 5, 6, 7, 8, 9, 10.b and 11]. This figure does not include commissions earned by Ben Hasho at First Jersey or Stuart–James. [Pl.Exh. 2801 at ¶ 5].

Mecca earned $23,109.40 in commissions in the accounts of Costa, Alexander, Natoli, Lambiase and Cherouvis. [Pl.Exh. 2801 at ¶¶ 4, 5, 6, 7, 8, 9, 10.c. and 11]. This figure does not include commissions earned by Mecca at First Jersey or Stuart–James. [Pl.Exh. 2801 at ¶ 5].

Yule earned $18,312 in commissions on trades in accounts of Steel, Caulfield, Sensibaugh, Hirsch, Garrette and Meyers. [Pl. Exh. 2801 at ¶¶ 4, 5, 6, 7, 8, 9, 10.d and 11]. This figure does not include commission earned at Stuart–James.

Vuono earned approximately $45,599.26 in commissions in the accounts of St. Clair, Conte, Guggino, Treat, and Beck. [Pl.Exh. 2801 at ¶ 10.h.].

### CONCLUSIONS OF LAW

This Court has jurisdiction of this action under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa. Venue in the Southern District of New York is proper under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1391(b). Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240, 10b–5, thereunder prohibit fraud in the offer or sale, or in connection with the purchase or sale, of securities. Section 17(a), which applies only to sellers, provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments or transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b), which applies to both buyers and sellers, makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." Pursuant to its rule-making authority under this section, the SEC promulgated Rule 10b–5, which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, artifice to defraud,

(b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The purpose of these provisions is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*," *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963), and thus to ensure that investors obtain disclosure of material facts in connection with their investment decisions regarding the purchase or sale of securities. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972).

■ To establish liability under these provisions, the SEC must establish by a preponderance of the evidence:[10] (1) a misrepresentation, or an omission (where there is a duty to speak), or other fraudulent device; (2) in the offer or sale, or in connection with the purchase or sale, of a security; (3) scienter on the part of a defendant, *Aaron v. SEC*, 446 U.S. 680, 701, 100 S.Ct. 1945, 1958, 64 L.Ed.2d 611 (1980); and (4) materiality, in the case of any misrepresentation or omission, *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). *See Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 744 (5th Cir.1984); *SEC v. Tome*, 638 F.Supp. 596, 620 (S.D.N.Y.1986).[11] In addition, the SEC must show the use of any means or instruments of transportation or communication in interstate commerce, or of the mails, or any facility of any national securities exchange. *See* 17 C.F.R. § 240.10b–5; 15 U.S.C. § 77q(a). Since the defendants communicated with customers through telephone calls and through confirmations and statements sent through the mails, the defendants utilized the mails, and other means of interstate commerce to perpetrate the frauds outlined in these findings.

### Misrepresentation or Omission

■ The issue of the existence of a misrepresentation or omission, or other fraudulent device is a question of fact. This Court found a number of misrepresentations and omissions in the proposed findings of fact, including: (1) misleading statements by defendants Ben Hasho and Mecca about their past performances as registered representatives and unjustified predictions that their recommendations would produce future profits; (2) false statements by defendants Mecca and Yule that they possessed inside information; (3) false statements by defendants Mecca and Vuono relating to the supply of securities available for sale; (4) omissions by each defendant regarding risk factors, such as the speculative nature of securities and negative earnings of issuers; (5) baseless price predictions and profit guarantees made by each defendant; (6) misrepresentations by defendants Mecca, Yule and Vuono about their commissions; and (7) unauthorized trading in customer accounts by each defendant accompanied by deception, misrepresentations, and omissions.

### In Connection With

■ The "in connection with" requirement has been construed broadly by the Supreme Court. *See Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Any statement that is reasonably calculated to influence the average investor satisfies the "in connection with" requirement of Rule 10b–5. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 861–62 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The defendants' statements to customers in this case were meant to persuade customers to purchase various securities and, therefore, were made in connection with the purchase or sale of a security. *See SEC v. Materia*, 745 F.2d 197, 203 (2d Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985).

---

**10.** *See Herman & McLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88 (1934); *SEC v. Tome*, 638 F.Supp. 596, 620 n. 45 (S.D.N.Y.1986), *aff'd*, 833 F.2d 1086 (2d Cir. 1987), *cert. denied*, 486 U.S. 1014, 1015, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988).

**11.** Unlike a private litigant asserting a cause of action under Rule 10b–5, the SEC does not have the additional burden of showing: (a) justifiable reliance upon the fraudulent device by the plaintiff; and (b) damages resulting from the fraudulent device.

*Scienter*

■ Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). The Second Circuit has held that knowledge or recklessness will satisfy the scienter requirement. *IIT v. Cornfeld*, 619 F.2d 909, 923 (2d Cir.1980); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 n. 98 (2d Cir.1973). Scienter is a question of fact, *Morgan v. Prudential Group, Inc.*, 527 F.Supp. 957, 958–59 (S.D.N.Y.1981), *aff'd*, 729 F.2d 1443 (2nd Cir.1983), and can be proved by circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir.1984). The scienter determination will "depend upon the circumstances of the particular case, including the nature and duties of the corporate positions held by the defendants." *Lanza*, 479 F.2d at 1306 n. 98. Any inference "to be drawn by a fact finder must be based on common experience and be logical and reasonable." *Steinberg v. Carey*, 439 F.Supp. 1233, 1237 (S.D.N.Y.1977).

■ Here, the defendants held themselves out as registered representatives. Securities dealers owe a special duty of fair dealing to their clients. *Charles Hughes & Co. v. SEC*, 139 F.2d 434, 437 (2d Cir.1943), *cert. denied*, 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944). By making a recommendation, a securities dealer implicitly represents to a buyer of securities that he has an adequate basis for the recommendation. *Hanly v. SEC*, 415 F.2d 589, 597 (2d Cir. 1969). The Second Circuit has held that "brokers and salesman are under a duty to investigate.... Thus a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant. He must analyze sales literature and must not blindly accept recommendation made therein." *Id.* at 595–96. By his recommendation, a registered representative "implies that a reasonable investigation has been made and that his recommendation rests on

the conclusions based on such investigation." *Id.* at 597. Although the degree of independent investigation which must be made by a securities dealer will vary in each case, securities issued by smaller companies of recent origin obviously require thorough investigation. *Id.* In this vein, the Second Circuit stated in *Hanly v. SEC*, 415 F.2d 589 (2d Cir.1969), that:

> [T]he standards by which [brokers] ... must be judged is strict. He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from his lack of information.

*Id.* at 597.

■ Salesmen or registered representatives have certain duties that they cannot avoid by reliance on either their employer or an issuer. A registered representative or salesman in a boiler room: (1) may not rely solely on his employer, *Berko v. SEC*, 316 F.2d 137, 142 (2d Cir.1964); (2) may not rely blindly upon the issuer for information concerning a company, *Hanly*, 415 F.2d at 596; *Levine v. SEC*, 436 F.2d 88, 90–91 (2d Cir.1971); and (3) cannot avoid his duty to investigate by blindly relying on his employers brochures. *See, e.g., Walker v. SEC*, 383 F.2d 344, 345 (2d Cir.1967). Furthermore, a registered representative is not shielded from liability if he actually believed the representations which he had no adequate basis to make. *Alexander Reid & Co., Inc.*, 40 S.E.C. 986, 990–91 (1962).

■ The defendants here operated a boiler room operation; they recommended speculative securities to mostly unsophisticated investors using high pressure and fraudulent sales pitches via long distance telephone solicitations. *See Hanly v. SEC*, 415 F.2d at 597 n. 14. Registered representatives dealing in over-the-counter

stocks are under a special duty not to take advantage of a customer's trust and confidence. *Charles Hughes & Co.*, 139 F.2d at 436–37. A salesperson engaged in boiler room activities cannot escape these duties and obligations by a claim of lack of knowledge. *Hanly v. SEC*, 415 F.2d at 595–96. Indeed, an individual involved in boiler room activities is held to a higher standard. *Berko*, 316 F.2d at 142.

In this case, the defendants' scienter consisted of knowing and, or, reckless misconduct. Defendant Vuono argues in his defense, and the other defendants contend in part, that their activities were made at the direction of their securities firm employers, and based on information provided by these employers and issuers. More specifically, defendant Vuono argues that he was naive and new in the securities industry and, therefore, was justified in relying on his employer and doing solely what he was told without investigation into the propriety of his actions, statements, and recommendations. Rather than negating intent, this defense establishes the requisite intent.

■ Those who hold themselves out as professionals with specialized knowledge and skill to furnish guidance can not be heard to claim youth or inexperience when faced with charges of violations of the anti-fraud provisions of the securities laws. *See Ramey Kelly Corp.*, 39 S.E.C. 756 (1960). Youth or inexperience does not excuse a registered representative's duty to his' clients. Moreover, such youth or inexperience does not excuse violations of the anti-fraud provisions of the securities laws. *See A.T. Brod & Co.*, 43 S.E.C. 289, 292 (April 26, 1967).

In their capacity as registered representatives, the defendants consistently and flagrantly, through misrepresentations, omissions, and other fraudulent devices, sold house stocks of their brokerage firm employers to personally profit through commission income generated by sales of these stocks. The defendants cannot hide behind reliance on employers and issuers to insulate them from liability. The evidence put forth by the SEC in this case shows that all of the defendants totally ignored their general duty of fair dealing. The defendants' flagrant conduct with numerous customers and the defendants' denial and attempted concealment of wrongdoing supports the conclusion that they acted knowingly and recklessly in violation of the anti-fraud provisions of the federal securities laws.

*Material*

■ The question of materiality is an objective one. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 445, 96 S.Ct. 2126, 2130–31, 48 L.Ed.2d 757 (1976) (defining the standard of materiality under proxy regulation 14a–9). "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 240, 108 S.Ct. 978, 988, 99 L.Ed.2d 194 (1988) (adopting the *TSC* standard to actions under Section 10(b) and Rule 10b–5). The SEC must show that the information in question "would have been viewed by the reasonable investor to have changed the 'total mix' of information made available." *Id.* 485 U.S. at 231–32, 108 S.Ct. at 983. Application of this standard requires a "delicate assessment of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2132. Material facts include "not only information disclosing the earnings ... of a company but also those facts which affect the probable future of a company and which may affect the desires of investors to buy, sell or hold the company's securities." *Texas Gulf Sulphur Co.*, 401 F.2d at 849; *see also Rothberg v. Rosenbloom*, 771 F.2d 818, 821 (3d Cir.1985), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 501 (1987). As long as the information withheld or the misstatements made are material, positive proof of reliance is not necessary to establish violations of the anti-fraud provisions. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985). As set out in the findings of fact, defendants

withheld material information and made several material misstatements to induce customers to purchase securities.

## I. Defendants' Violations of the Anti-Fraud Provisions

■ During the course of their telephone solicitations, Mecca and Yule frequently stated or implied that they possessed favorable inside information about securities that they were recommending to their customers. These assertion falsely bolstered their recommendations by lending an air of certainty and authority to them. The false assertion by a registered representative, in connection with the offer, purchase or sale of securities, that the registered representative possesses "inside" or material non-public information regarding an issuer, is a material misstatement violative of the anti-fraud provisions of the federal securities laws. *See e.g., Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 312, 105 S.Ct. 2622, 2630, 86 L.Ed.2d 215 (1985); *Hiller v. SEC,* 429 F.2d 856, 857–58 (2d Cir.1970).

Mecca and Vuono falsely told customers that stock was available for purchase only in a certain minimum size block. These material misrepresentations, which were designed to induce customers to purchase a large number of a certain security, constitute violations of the anti-fraud provisions of the federal securities laws. *See SEC v. R.A. Holman & Co.,* 366 F.2d 456, 458 (2d Cir.1966).

As described in the findings of fact, the four defendants failed to disclose material information about the issuers of securities they recommended to customers. Defendants failed to disclose risk factors and the past negative earnings of issuers. In addition, defendants either failed to disclose or misrepresented the speculative nature of the securities they recommended to customers. The failure to disclose such material information violates the anti-fraud provisions of the federal securities laws.

■ Failure to disclose the speculative nature of securities recommended or negative financial information about issuers, violate the anti-fraud provisions. *See, e.g.,*

*Hanly,* 415 F.2d at 595–97; *R.A. Holman & Co.,* 366 F.2d at 458; *SEC v. Rega,* [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,222 at 98, 148, 1975 WL 4508 (S.D.N.Y.1975); *SEC v. Capital Counsellors, Inc.,* 332 F.Supp. 291, 302 (S.D.N.Y. 1971). An issuer's negative earnings are something to which a reasonable investor attaches importance. *See SEC v. Murphy,* 626 F.2d 633, 653 (9th Cir.1980); *R.A. Holman & Co.,* 366 F.2d at 459. In fact, numerous customer witnesses in this case testified that they attached importance to such information.

■ During the course of telephone solicitations, the defendants made baseless price predictions, profit guarantees and told investors that they would recoup past investment losses if they followed the defendants' investment advice. The representation that an investment will recoup losses from previous investments is a price or profit prediction. Guarantees and predictions of substantial price rises with respect to securities are actionable absent a reasonable basis for the prediction. *See e.g., R.A. Holman & Co.,* 366 F.2d at 458; *SEC v. Wellshire Securities, Inc.,* 737 F.Supp. 251, 256 (S.D.N.Y.1990); *Rega,* [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,222 at 98,148. The fraud is not ameliorated where the positive prediction about the future performance of securities is cast as opinion or possibility rather than as a guarantee. Such material statements violate the anti-fraud provisions if no adequate basis existed for making such a statement. *See, e.g., Hiller v. SEC,* 429 F.2d at 858. Since the defendants mostly recommended securities of unprofitable start-up corporations, of which defendants did no personal research, their price predictions and guarantees could not have had a reasonable basis in fact. Indeed, many of the recommendations went down in price substantially after the customer witnesses purchased these securities.

■ Mecca, Yule, and Vuono falsely stated to customers that they would earn no commissions, or misrepresented the amount of commissions on transactions in

**1110**

customers' securities. Such material misrepresentations are violative of the anti-fraud provisions of the federal securities laws. *See SEC v. American Institute Counselors, Inc.,* [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,388, at 98,954 (D.D.C.1975). In addition, Ben Hasho, Mecca, Yule, and Vuono never disclosed to customers the amount of commissions that they were earning on customer purchases of in house stocks. The failure to disclose such commissions deprives the customer of the knowledge that his registered representative might be recommending a security based upon the registered representative's own financial interest rather than the investment value of the recommended security. Misrepresenting or omitting to disclose a broker's financial or economic incentive in connection with a stock recommendation constitutes a violation of the anti-fraud provisions. *See Chasin v. Smith, Barney & Co.,* 438 F.2d 1167, 1172 (2d Cir.1970).

■ The defendants engaged in unauthorized trading in customer accounts. Unauthorized trades are illegal when accompanied with "deception, misrepresentation or non-disclosure" to be actionable under Rule 10b–5. *Pross v. Baird Patrick & Co.,* 585 F.Supp. 1456, 1459 (S.D.N.Y.1984); *see Wellshire Securities, Inc.,* 737 F.Supp. at 259; *Cruse v. Equitable Securities of New York, Inc.,* 678 F.Supp. 1023, 1028–29 (S.D.N.Y.1987); *Bischoff v. G.K. Scott & Co., Inc.,* 687 F.Supp. 746, 750–51 (E.D.N.Y.1986); *Newman v. Smith,* [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,078, at 97,785 (S.D.N.Y.1975). A pattern of unauthorized transactions occurred in accounts serviced by the defendants. Many of these trades were preceded by the customers' refusals to purchase the securities recommended by defendants. In addition, the defendants frequently talked the customers into ratifying unauthorized trades after they occurred. When attempting to get their customers to ratify unauthorized transactions, the defendants often made numerous misrepresentations

regarding, among other things, the future price of the securities. Since these unauthorized trades were the result of, and were accompanied by, material "deception, misrepresentation or non-disclosure" they violated the anti-fraud provisions of the securities laws. *See Bischoff,* 687 F.Supp. at 750–51; *Pross,* 585 F.Supp. at 1459.

■ In addition, defendant Vuono, without customer authorization, traded securities on margin in customer accounts. Several of Vuono's customers testified to virtually identical patterns of unauthorized margin trading in their J.T. Moran accounts. Purchasing securities on margin in customer accounts without customer approval, violates the anti-fraud provisions of the securities laws. *See DelPorte v. Shearson, Hammill & Co., Inc.,* 548 F.2d 1149, 1152–53 (5th Cir.1977).

## II. *Remedies*

### A. Permanent Injunction

■ Once the SEC has proven a defendant's violation of the securities laws and regulations, it must then make a "proper showing" for injunctive relief within the meaning of Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act. *Aaron v. SEC,* 446 U.S. 680, 689, 100 S.Ct. 1945, 1952, 64 L.Ed.2d 611 (1980). In order to make such a showing, the SEC must demonstrate by a preponderance of the evidence that there is a "reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100–01 (2d Cir.1972).[12] In determining whether a permanent injunction is appropriate, a "district court is called upon to assess all those considerations of fairness that have been the traditional concerns of equity courts." *Id.* at 1102. The Second Circuit has specified certain factors to consider, including:

the likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent na-

12. In the preliminary injunction context, the Second Circuit now requires the SEC to establish a "substantial likelihood" that the wrong will be repeated. *SEC v. Unifund SAL,* 910 F.2d 1028, 1039–40 (2d Cir.1990).

ture of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied sub nom., Homans v. SEC*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). Given the serious consequences of injunctive relief, the Second Circuit has placed emphasis on the need of the SEC to prove more than the mere fact of past violations, but also a realistic likelihood of recurrence. *See, e.g., SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 100 (2d Cir.1978).

 In light of the defendants' past violations, which occurred repeatedly over a protracted period of time, the degree of scienter involved, their lack of remorse, their young age, and current access to the marketplace, injunctions are clearly appropriate. *SEC v. World Gambling Corp.*, 555 F.Supp. 930, 933 (S.D.N.Y.1983), *aff'd without op.*, 742 F.2d 1440 (2d Cir.1983), *cert. denied*, 465 U.S. 1112, 104 S.Ct. 1620, 80 L.Ed.2d 148 (1984). Defendants consistently violated their clients' trust through a myriad of omissions, misrepresentations, and other fraudulent devices. This is not a case of well intentioned and scrupulous registered representatives allowing isolated violations to occur "out of an excessive zeal for fairness and accuracy." *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 19 (2d Cir.1977). On the contrary, defendants repeatedly violated the securities laws and their clients' trust for their personal benefit. Moreover, defendants have failed to take responsibility for their securities violations. These defendants do not belong in the securities industry or in any other occupations where they are in a position to defraud the public. It is impossible for this Court to rely on defendants' representations that they will not engage in future violations of their clients' trust and the securities laws.

B. Disgorgement

 A federal district court's authority to order disgorgement in an SEC enforcement action is well-established. *See e.g., SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir.1972). Once this Court finds a violation of the federal securities laws, it may, pursuant to its general equitable powers, order disgorgement of monies so as to prevent a defendant from profiting from his illicit conduct. *See, e.g., SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987) ("The paramount purpose of enforcing the prohibition against insider trading by ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing"). The deterrent effect of SEC enforcement actions would be diminished if securities law violators were not required to disgorge illicit profits, but disgorgement may not be used punitively. *See Manor Nursing Centers, Inc.*, 458 F.2d at 1104. Disgorgement is an equitable remedy "uniquely suited to redress or cancel unfairness and promote investor confidence in securities transactions." *SEC v. World Gambling Corp.*, 555 F.Supp. 930, 934 (S.D.N.Y.1983) (citation omitted). As well as the injunctions, disgorgement is an appropriate remedy in this case.

 "[T]here cannot be any perfect measure of damages." *Elkind v. Liggett & Meyers, Inc.*, 635 F.2d 156, 172 (2d Cir. 1980). Accordingly, "disgorgement need only be a reasonable approximation of profits causally connected to the violation." *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C.Cir.1989). The SEC has the burden to put forth a disgorgement figure that reasonably approximate the amount of unjust enrichment and then the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." *Id.* at 1232. In cases where courts have reduced or changed the disgorgement figure put forth by the SEC, "the defendant demonstrated a clear break in or considerable attenuation of the casual connection between the illegality and the ultimate profits." *Id.* When a defendant engages in a pervasive pattern of fraudulent conduct as opposed to isolated instances, it is unnecessary to prove a direct nexus between each

instance of unlawful conduct and the disgorgement amount due. *See CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 94 (2d Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).

Due to the pervasive nature of the fraud in this case, the proper measure of disgorgement is the amount of commissions earned by each defendant in each of the customer witnesses' accounts. This has been the SEC's position throughout the course of this litigation and the defendants have failed to put forth an alternative method. *See SEC v. First City Financial Corp., Ltd.*, 890 F.2d at 1231. The defendants have failed to prove any break between the illegal conduct and the amount of disgorgement sought. *Id.* at 1232. Moreover, the disgorgement figures put forth by the SEC are understated because they do not include commissions earned by defendants Ben Hasho and Mecca at First Jersey and by Ben Hasho, Mecca, and Yule at Stuart–James.

C. Prejudgment Interest

■ Prejudgment interest on damages awarded pursuant to a violation of the federal securities laws is a matter of judicial discretion. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 50 (2d Cir.1978); *Quintel Corp. v. Citibank, N.A.*, 606 F.Supp. 898, 914 (S.D.N.Y.1985). In exercising its discretionary powers, a court must consider both compensation and fairness. *Quintel Corp.*, 606 F.Supp. at 914. An award of prejudgment interest is intended to compensate an aggrieved party for the wrongful deprivation of its money. *Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77, 87 (2d Cir.1980). In addition, "awards of prejudgment interest are governed by fundamental considerations of fairness." *Id.* Prejudgment interest is customarily awarded in cases involving a breach of fiduciary duty. *See id.; Norte & Co. v. Huffines*, 416 F.2d 1189, 1191 (2d Cir.1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970).

■ In this case, defendants breached their duty of fair dealing with their clients and wrongly deprived their clients of money. Accordingly, defendants' clients were both deprived of this money and the opportunity to realize a fair rate of return on the money. Under New York law, prejudgment interest is calculated 9% simple interest for all claims arising after June 25, 1981. N.Y.C.P.L.R.Law § 5004 (McKinney 1988); *see Quintel Corp.*, 606 F.Supp. at 915.

SO ORDERED.